

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-1-1994

# Armbruster, et al. v. UNISYS Corp.

Precedential or Non-Precedential:

Docket 91-0594

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"Armbruster, et al. v. UNISYS Corp." (1994). *1994 Decisions.* Paper 99.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/99

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 93-1333

_____


JOHN P. ARMBRUSTER; SHIRISH K. DIVEHCA; JAMES G.
DODSON; JON E. KINARD; WILLIAM MILLER; WILLIAM N.
MORITZ; JOHN PATTON; JEROME ROBIN; EDWARD L.
SHOWALTER; THOMAS C. STEVENS; JAMES TURNER;
MICHAEL J. YAGLEY; WILLIAM P. YANAN

v.

UNISYS CORPORATION


(D.C. Civil Action No. 91-05948)

_____


BASIL IWASHYNA

v.

UNISYS CORPORATION


(D.C. Civil Action No. 92-01402)


JOHN P. ARMBRUSTER; SHIRISH K. DIVECHA; JAMES G.
DODSON; JON E. KINARD; WILLIAM MILLER; WILLIAM N.
MORITZ; JOHN PATTON; JEROME ROBIN; EDWARD L.
SHOWALTER; THOMAS C. STEVENS; JAMES TURNER;
MICHAEL J. YAGLEY; WILLIAM P. YANAN; BASIL
IWASHYNA,
                          Appellants

_____


Appeal from the United States District Court
for the Eastern District of Pennsylvania

_____


1

Argued:  October 7, 1993


PRESENT:  HUTCHINSON, COWEN and NYGAARD, <u>Circuit Judges</u>

(Filed  August 1, 1994)

Walter H. Flamm, Jr., Esquire          (Argued)
Frank P. Spada, Jr., Esquire
Michael J. Torchia, Esquire
Clark, Ladner, Fortenbaugh & Young
21st Floor
One Commerce Square
2005 Market Street
Philadelphia, PA     19103
          Attorneys for Appellants

Michael J. Ossip, Esquire              (Argued)
Joseph J. Costello, Esquire
Stacy K. Weinberg, Esquire
Morgan, Lewis & Bockius
2000 One Logan Square
Philadelphia, PA     19103

          and

Joseph A. Teklits, Esquire
Unisys Corporation
Township Line and Union Meeting Roads
P.O. Box 500, M.S. C2N214
Blue Bell, PA     19424
          Attorneys for Appellee

Steven S. Zaleznick, Esquire
Cathy Ventrell-Monsees, Esquire
Thomas W. Osborne, Esquire
American Association of Retired Persons
601 E Street, N.W.
Washington, DC     20049
          Attorneys for Amicus Curiae American Association
          of Retired Persons

---

OPINION OF THE COURT

---

HUTCHINSON, <u>Circuit Judge</u>.


I.  <u>Introduction</u>

Appellants, John P. Armbruster et al. (Armbruster Group),[0] seek reversal of an order granting summary judgment in favor of appellee, Unisys Corporation (Unisys), on their claim of age discrimination under the Age Discrimination in Employment Act (ADEA), 29 U.S.C.A. §§ 621-634 (West 1985 & Supp. 1994).[0]  The Armbruster Group consists of fourteen Unisys employees who were terminated in February 1991 in the course of a reduction-in-force (RIF) at Unisys.  The Armbruster Group claims Unisys targeted them for termination because of their age and sought to mask its illegal discrimination by selecting them for a new work group the company created for older persons it intended to terminate.  Unisys then fired them almost immediately after the formation of the new group, ostensibly because the group had no work.

---

[0]The fourteen appellants making up the Armbruster Group are John Armbruster, Shirish K. Divecha, James G. Dodson, Jon E. Kinard, William D. Miller, William N. Moritz, John Patton, Jerome I. Robin, Edward L. Showalter, Thomas C. Stevens, James Turner, Michael J. Yagley, William P. Yanan and Basil Iwashyna.
[0]The district court also entered summary judgment in favor of Unisys on the Armbruster Group's claim that Unisys terminated them to limit their pension benefits in violation of section 510 of the Employee Retirement Income Security Act (ERISA), 29 U.S.C.A. § 1140 (West 1985).  The Armbruster Group does not raise this issue in its brief on appeal and therefore we will not consider it.

On appeal the Armbruster Group contends they produced evidence sufficient to show what is commonly referred to as a "mixed motives" age discrimination case by introducing overt evidence of discriminatory animus of the kind Justice O'Connor described in her concurrence in <u>Price Waterhouse v. Hopkins</u>, 109 S. Ct. 1775 (1989).[0]  They also contend that the district court should not have granted summary judgment because it failed to view the evidence of pretext in the light most favorable to them, made its own credibility determinations, ignored evidential facts as well as reasonable inferences arising from them and

---

[0]The Armbruster Group also argues section 107(a) of the Civil Rights Act of 1991 (1991 Act), codified at 42 U.S.C.A. § 2000e-2(m) (West Supp. 1994), applies retroactively to entitle them to a liability finding once they prove age was a "motivating factor" in the employment decisions surrounding their transfer into and termination from the new work group.

The parties failed to brief the question whether section 107(a) applies to ADEA as well as Title VII actions.  Even if it applied to ADEA, we believe section 107(a) would not govern pre-enactment conduct.  In <u>Landgraf v. USI Film Products</u>, 62 U.S.L.W. 4255 (U.S. 1994) and <u>Rivers v. Roadway Express, Inc.</u>, 62 U.S.L.W. 4271 (U.S. 1994), the United States Supreme Court held sections 102 and 101, respectively, are not retroactive.  Section 102 imposes additional liability for compensatory and punitive damages when a violation of Title VII has been shown.  The Court looked to the text of the amendments and the legislative history and concluded there was no expression of Congressional intent to apply section 101 or section 102 retroactively.  Therefore, they could not receive retroactive application because they altered the extent of a party's liability.  <u>Landgraf</u>, 62 U.S.L.W. at 4266-67.  To prevail, the Armbruster Group would have to persuade us that section 107(a) did not alter the standard of causation and the extent of liability by removing an employer's complete <u>Price Waterhouse</u> defense that it would have taken the same employment action based on a nondiscriminatory consideration. <u>See</u> H.R. Rep. No. 102-40(I), 102d Cong., 1st Sess. 45, 48-49, <u>reprinted</u> <u>in</u> 1991 U.S.C.C.A.N. 583, 586-87 (legislative history of 1991 Act); <u>see</u> <u>also</u> <u>infra</u> n.14.  We will not decide that issue absent full briefing.

incorrectly excluded as hearsay an alleged discriminatory statement made by a Unisys manager.

We hold that the district court correctly concluded the Armbruster Group's evidence of discrimination does not make out a Price Waterhouse case. We also hold, however, that the district court erred in granting summary judgment against the Armbruster Group because the circumstantial evidence present on this record, viewed in the light most favorable to the Armbruster Group, leaves a genuine issue of material fact as to whether Unisys's proffered explanation for its termination of the members of the group was a pretext for discrimination.[0]

## II. Factual History

Unisys was created in late 1986 after the merger of the Sperry and Burroughs Corporations. It then employed more than 120,000 people. During 1989, 1990 and 1991, Unisys encountered severe financial difficulties and, in those years, suffered losses of about $746 million, $551 million and $1 billion dollars. By November 1, 1992, Unisys's workforce had been reduced by half to about 60,000. The members of the Armbruster

---

[0]On appeal, the Armbruster Group also contends, for the first time, that Unisys's criteria for selection of the new work group had a disparate impact on members of the protected class and Unisys failed to introduce any evidence of business necessity that could justify this discriminatory act. Whether a disparate impact theory of liability is even available under ADEA has yet to be addressed by the Supreme Court. See Hazen, 113 S. Ct. at 1706. In any event, because the district court has not yet addressed this issue, we think it would be inappropriate for us to consider it. See Frank v. Colt Indus., Inc., 910 F.2d 90, 100 (3d Cir. 1990).

Group had worked for either Sperry or Burroughs before the merger and, at the time of their termination, averaged almost twenty-five years of service.

The specific facts material to this case began to unfold in the summer of 1990. Gerald Gagliardi (Gagliardi), a Unisys Vice President, then headed an organization within Unisys that was known as Customer Technical Services (CTS). Unisys organized CTS in 1989 so that Unisys employees, rather than non-Unisys third party vendors, could provide post-sale service and support to customers. Its goal was to unify four different divisions within Unisys and eliminate a $150 million loss that Gagliardi believed was caused by a loose practice of hiring third party vendors to perform project management and evaluate and bid large software projects. Until CTS was formed, each of Unisys's four divisions performed these functions separately.

Gagliardi began to organize a group within CTS to provide project management for all four Unisys divisions. It came to be known as the CTS Project Management Organization (CTS/PMO). Gagliardi did not have a formal business plan for this project but believed, from his own observations, that a demand for project management existed in all four Unisys divisions. Gagliardi first commandeered twelve men managed by Robert Johnson (Johnson) from an existing project management organization within Unisys's Systems Management Group (SMG), placing Johnson in charge.

In early November of 1990, four or five more people were transferred into the CTS/PMO at Gagliardi's direction. At

6

his deposition, Johnson testified that Gagliardi personally identified the transferees for him and did not give him an opportunity to reject them. Johnson testified he immediately became concerned because there was not enough project management work for his twelve man SMG group, let alone the added transferees.

Gagliardi, however, continued to believe even more project managers would be needed to do the anticipated surge of work for the new CTS/PMO organization and so he asked David Wedean (Wedean), Vice President of Applications Development and Central Support Services at both Unisys's Atlanta, Georgia and Radnor, Pennsylvania offices, to select persons within Unisys who would be capable of performing project management work. Wedean contacted Atlanta site manager Michael Sacco (Sacco) and Radnor site manager Margaret Ryan (Ryan) and asked them to identify PMO candidates using three criteria: (1) persons who had actual project management experience or otherwise showed the skills and experience needed to perform the work; (2) persons underutilized in their present positions; and (3) persons whose transfer would be least disruptive to their present organization.

The parties disagree on who actually selected the employees to be transferred into the CTS/PMO, and there is scant evidence in the record on this issue. Some deposition testimony, however, does support the Armbruster Group's contention that Gagliardi was involved in the selection of who was to be transferred into the CTS/PMO. See Joint Appendix (Jt. App.) at A-19, A-759-60. It is clear that Sacco and Ryan met with Wedean,

7

Johnson and Frank Haslam (Haslam), Director of Human Resources for CTS, in November 1990 to review a list of transferees that had been prepared. According to Johnson, the decision on who was going to be transferred into the CTS/PMO had already been made; he reviewed the list only "[t]o just understand who the people were . . . [i]dentify the people, verify where they were coming from, and who should announce to them initially that this was taking place; that kind of thing." Jt. App. at A-762. Johnson testified he did not request additional people for his group, had nothing to do with the selection of CTS/PMO candidates and simply acquiesced in Gagliardi's desire to place additional persons in the CTS/PMO. Wedean also testified that, as they reviewed the list with Johnson, Johnson relied on Ryan's and Sacco's opinions because Johnson did not know any of the individuals.

By late November 1990, approximately forty Unisys employees were transferred into the CTS/PMO group based in Blue Bell, Pennsylvania.[0] Many of them met with Johnson that very afternoon after their supervisors had told them about the transfer. During this introductory meeting, Johnson explained the nature and goals of the CTS/PMO. According to one Armbruster Group member, Johnson stated Unisys was "pulling senior people together to do it." Jt. App. at A-171.

Another smaller group of thirty-five individuals was brought into an Atlanta based CTS/PMO to make up the CTS/PMO's

---

[0]It is not clear from the record whether all of the 40 Unisys employees came from Unisys's Radnor office or whether some were from other Unisys offices, such as Atlanta.

8

full complement. Armbruster Group member James Turner (Turner), who was the Director of the General Accounting Applications Business Unit in Atlanta before he was transferred into the Blue Bell CTS/PMO, testified that the Atlanta transferees were not told of the transfer until the day it occurred and that Wedean instructed Sacco and others to have the Atlanta transferees move their belongings out of their offices and to deactivate their badges immediately because Wedean was concerned that the transferees might damage the office if they had access to it over the weekend.[0]

The CTS/PMO began functioning officially on December 1, 1990. Johnson did not give the transferees any assignments from then until their termination nearly three months later, even though they repeatedly requested work. Although the transferees had nothing to do, Johnson discouraged them from completing projects they had worked on with their former organizations because those projects were "not . . . project management kind[s] of task[s]." Jt. App. at A-773. Johnson admitted it was his responsibility, along with his field personnel, to find work for the transferees. He did not remember any new personnel receiving any assignments.

As the transferees were arriving at the Blue Bell facility only three offices were available and they were assigned

---

[0] All 35 Atlanta CTS/PMO transferees were terminated on February 26, 1991. Three brought suit against Unisys alleging age discrimination under ADEA and the district court granted summary judgment against them. See Meeker v. Unisys Corp., Civ. No. 1:92-CV-246-ODE (N.D. Ga. May 11, 1993), appeal dismissed, No. 93-8777 (11th Cir. Feb. 23, 1994).

on a first-come, first-served basis. All but the first three transferees were assigned to cubicles. Johnson's office and his SMG group were separated from the transferees by a partition. Most of the transferees were not provided with computers and they were not allowed to bring computers with them from their old Unisys offices. "Manager Phones" (telephones with speakers) were taken away and replaced with regular phones. The transferees received only one and a half days of general CTS training, but they were allowed to attend in-house courses and training upon their own initiative when any were available. They never received business cards, although Johnson testified he intended to provide them.

Shortly after the official start of CTS/PMO operations in early December 1990, Gagliardi was promoted and transferred to another Unisys organization. On January 1, 1991, James Lee Hillberg (Hillberg) replaced Gagliardi as Vice President and General Manager of CTS. Hillberg's job was to make CTS profitable as quickly as possible. When Hillberg met with Johnson, he learned that the productivity of Johnson's original twelve man SMG group was very low and that the transferees had no work at all. Hillberg instructed Johnson to prepare a forecast of Unisys's needs for project management work by region. On January 7, 1991, Johnson sent a memorandum to all regional CTS Vice Presidents requesting a forecast of project manager work for 1991. The responses showed a level of demand that was less than anticipated and Hillberg decided on an immediate reduction-in-force (RIF) because the number of employees in the CTS/PMO

10

greatly exceeded the number needed to perform the work anticipated.  Hillberg testified, however, "[t]here was never any discussion of totally eliminating [the SMG] group."  Jt. App. at A-825.

Hillberg directed Johnson and Haslam to select criteria appropriate for identifying individuals for the RIF.  Johnson produced a Staff Adjustment Analysis (Analysis) listing each of the RIF candidates, their job title, social security number, date of hire, age, race and sex, among other things.  Attached to the Analysis was a chart entitled "Skills/Experience Matrix" which listed each RIF candidate's current project assignment, project management experience, related experience and other related background.

In his Analysis, Johnson concluded the forecasted workload required only fifteen project managers and identified the fifteen most qualified for retention.  Those slated for retention included all of the SMG group and three transferees.  After reviewing Johnson's Analysis, Hillberg decided to keep only twelve project managers and asked Johnson to eliminate three more persons from the retention list.  From the group of fifteen, Johnson selected the four with the least project management experience and retained the oldest, age 54.  Hillberg, Haslam and a Unisys attorney reviewed and approved Johnson's proposed terminations.  Ultimately all but one of the CTS/PMO transferees were terminated and all of Johnson's SMG group were retained.  Only two of those retained were less than 40 years of age.

On February 26, 1991, Johnson met with the Blue Bell project managers selected for the RIF and announced their immediate termination. The human resources department circulated their resumes within Unisys and found positions for some, but not all. Among those terminated were the employees in the Armbruster Group. After the RIF, Johnson's SMG group continued to do complex project management work. More routine project management work was handled by CTS's regional field organizations. No additional personnel were hired or transferred into the centralized CTS/PMO after the terminations in February 1991.

Armbruster Group member Yanan was out on disability leave when he was officially transferred into the CTS/PMO and when the other transferees were later terminated. When he returned to work in March of 1991 he reported to Johnson in Blue Bell. Three days later, Weimer, the human resource representative assigned to the Blue Bell CTS/PMO, terminated him. During conversations with Weimer, Yanan says Weimer and he discussed the reasons for the transferees' terminations and Weimer told Yanan the transferees "should have seen the writing on the wall" because they were not told anything for three months. Jt. App. at A-655. Weimer also is said to have stated sarcastically, "Gagliardi wouldn't do that, would he?" in response to Yanan's questioning whether age was the reason for the terminations. Jt. App. at A-662.

## III. Procedural History

12

The Armbruster Group filed suit against Unisys in the district court on September 20, 1991, alleging: (1) their selection for and layoff from the CTS/PMO violated ADEA; and (2) Unisys terminated them to prevent or limit their pension benefits in violation of ERISA.[0] The district court granted Unisys's motion for summary judgment.

In its opinion the district court first concluded that the Armbruster Group's evidence failed to make out a Price Waterhouse case. In so concluding, the court considered several pieces of evidence which the Armbruster Group contended showed an overt discriminatory animus. It first considered age-related comments allegedly made by Robert Markell (Markell), a Unisys Vice President who resigned in August of 1990, and a 1988 comment by Doyle Perry (Perry), President of Unisys's Public Sector Division. Markell's statements were allegedly made at an April 19, 1990 meeting to discuss labor costs at Unisys's Radnor offices. Armbruster Group members Armbruster and Iwashnya, who were in attendance, claim Markell stated Unisys could not "afford to keep people over 50 and 50," meaning those over 50 years of age who were earning over $50,000.00 annually. Armbruster v. Unisys Corp., Civ. A. Nos. 91-5948, 92-1402, 1993 WL 93975, at *8 (E.D. Pa. March 24, 1993). The district court decided this statement was inadmissible double hearsay under Federal Rules of Evidence 801(d)(2)(D) and 805 because the Armbruster Group could not identify the individual members of upper management for whom

---

[0]Basil Iwashyna filed a similar complaint against Unisys on March 6, 1992. The district court consolidated the actions.

13

Markell was speaking and so qualify the statement as an admission by a party opponent. Markell did not know whether the persons who made the statement had anything to do with CTS/PMO employment decisions. Markell left Unisys four months before creation of the CTS/PMO and there was no evidence to show that Markell himself was involved in any of the CTS/PMO decisionmaking.

The court also considered a series of Unisys documents that the Armbruster Group offered as overt evidence of discriminatory animus. The Armbruster Group contended a memorandum (Haslam memorandum) dated September 30, 1990, from Haslam to Gagliardi and Donlon, Vice President of Human Resources, about transferring some persons into CTS or terminating them in a RIF demonstrated age was a substantial factor in Unisys's decision to transfer them into and then terminate them from the CTS/PMO because the memorandum showed the ages of Armbruster Group members Kinard and Yanan. The Armbruster Group also contended other Unisys personnel documents containing age information, some concerning the CTS/PMO transfer and RIF and others applying to Unisys employees generally, were overt evidence of discriminatory animus in the selection, transfer and RIF of individuals in the CTS/PMO.

The district court concluded these memoranda were not enough to show a Price Waterhouse case because references to age in a document concerning a personnel decision are not in and of themselves overt evidence of discriminatory animus based on age. The court noted that the Armbruster Group failed to introduce any evidence to support an inference that the age notations on the

14

documents showed Unisys had a mind to discriminate on the basis of age. In fact, Unisys introduced evidence tending to show it routinely includes such age and ethnic information to prevent discrimination. The Armbruster Group did not cite any legal authority in support of its theory that the mere appearance of age and date of birth information in a record concerning an employment decision permits an inference of intentional discrimination under Price Waterhouse. Thus, the district court decided it should, as a matter of policy, reject the Armbruster Group's Price Waterhouse theory to avoid a perverse effect on a business's attempt to prevent discrimination through inclusion of information about its employees' age and race in its personnel records.

The court next considered whether the Armbruster Group's evidence established a pretext case. Utilizing the burden-shifting analysis set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981), the court assumed and Unisys stipulated that the Armbruster Group's evidence showed a prima facie case.[0] The court then concluded Unisys's evidence established legitimate, nondiscriminatory reasons for creating the CTS/PMO and later terminating the transferees, including the Armbruster Group. Accordingly, it examined the evidence the

---

[0]Because 10 of the 12 persons ultimately retained in the CTS/PMO were over 40 years old, the court noted some uncertainty on whether the Armbruster Group met the fourth element of the McDonnell Douglas/Burdine prima facie case, i.e., that plaintiffs were replaced by unprotected, younger individuals.

15

Armbruster Group offered to show that Unisys's explanation was pretextual. That evidence included the absence of any business plan to support a need for the CTS/PMO. In this connection, the Armbruster Group argued it was highly unlikely that a sophisticated corporation like Unisys would take action to form the CTS/PMO without a business plan showing a need at the same time that it was drastically downsizing operations. The district court decided the evidence indisputably refuted the Armbruster Group's theory that Unisys created the CTS/PMO for the sole purpose of terminating the transferees. It said:

> [this] strains credulity. Acceptance of plaintiffs' theory would effectively mean that [Unisys] received the willing cooperation of perhaps dozens of Unisys officials, to the point of having officers take promotional steps, such as asking CTS management around the country to identify opportunities for the new group, in laying off an additional thirty-five (35) employees. Since defendant had terminated thousands of employees in the wake of an unfortunate financial crisis, a reasonable jury would engage in impermissible speculation by inferring, as plaintiffs urge, that [Unisys] would expend the money, time, and effort needed to create and later dissolve a new organization merely to fire additional personnel.

Armbruster, 1993 WL 93975, at *13.

The court also considered a number of comments allegedly made by Unisys supervisors, including Wedean's statement that the Atlanta CTS/PMO transferees should be moved out of their offices quickly, Well's statement that he had been told to select his "senior people" for the CTS/PMO and human

16

resource staff member Weimer's remarks that the transferees "should have seen the writing on the wall" and his allegedly sarcastic statement "Gagliardi wouldn't do that, would he?" The court concluded these statements, if made, were legally insufficient to allow an inference of pretext because they were merely stray remarks.

The court also rejected the Armbruster Group's theory that seniority, grade level and high salary were code words for age at Unisys and that Unisys's mention of them in documents concerning the CTS/PMO personnel decisions was evidence of pretext. First, the court observed that the three criteria used in selecting candidates for the CTS/PMO did not include salary or grade level. Second, it concluded that this theory was decisively contradicted by other evidence, including evidence that the oldest Armbruster Group member, Moritz, was earning the lowest salary of all the plaintiffs when he was terminated, while one of the youngest Armbruster Group members, Turner, was earning the highest salary. The court also considered a memorandum from Donlon (Donlon memorandum), the Vice President of the Human Resources Department, suggesting subsequent RIFs would focus on high level, highly paid management employees "who have little or no impact on customer satisfaction or revenue attainment." Id. The court rejected the Donlon memorandum as evidence of pretext because it did not specifically mention age or the CTS/PMO.

Finally, the Armbruster Group argued Unisys could not rely upon the cost savings resulting from termination of high salaried employees as a nondiscriminatory justification for

17

terminating employees in the protected age group. The court determined the evidence did not support the Armbruster Group's argument that Unisys was motivated by their high salaries because the average salary of those retained was $3,200.00 higher than the average salary of those terminated. In any event, the court reasoned that ADEA does not prohibit an employer in financial difficulties from considering costs in making personnel decisions.[0]

The district court therefore concluded the Armbruster Group failed to show a genuine disputed issue of material fact as to pretext because the evidence did not show that the reason Unisys gave for terminating members of the Armbruster Group was a pretext for discrimination. Accordingly, it granted summary judgment to Unisys on the Armbruster Group's ADEA claim. The district court also granted summary judgment to Unisys on the Armbruster Group's ERISA claim. The Armbruster Group timely appealed the order granting summary judgment, but it does not pursue the ERISA claim on this appeal. See supra n.2.

IV.  Standard of Review

When reviewing an order granting summary judgment we exercise plenary review and apply the same test the district

---

[0]The American Association of Retired Persons (AARP) filed a brief amicus curiae protesting the district court's "unfortunate use of . . . language" which AARP believes "create[ed] the false impression that under the ADEA cost-savings somehow justifies otherwise unlawful age discrimination." Brief for Amicus at 4. This statement is dicta in the district court's opinion and, because we will reverse the district court for other reasons, we do not address this question.

court should have applied.  Under Federal Rule of Civil Procedure 56(c) that test is whether there is a genuine issue of material fact and, if not, whether the moving party is entitled to judgment as a matter of law.  Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992).  In so deciding, a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.  Id.  There must, however, be sufficient evidence for a jury to return a verdict in favor of the nonmoving party; if the evidence is merely colorable or not significantly probative, summary judgment should be granted.  Id.  "A disputed fact is 'material' if it would affect the outcome of the suit as determined by the substantive law."  Id. (citing Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986)).

V.   "Mixed Motives" Analysis

We first consider whether the Armbruster Group's evidence presented a so-called "mixed motives" age discrimination case.[0]  The proof needed to establish a typical Price Waterhouse framework for a claim alleging discriminatory discharge has differed substantially from the framework in presenting a pretext case.  In a typical ADEA pretext case, the plaintiff can raise an inference of age discrimination by showing (1) he is within the protected age class, i.e. over forty; (2) he was qualified for the position at issue; (3) he was dismissed despite being qualified; and (4) he was replaced by a person sufficiently younger to permit an inference of age discrimination.  Burdine, 450 U.S. at 253; McDonnell Douglas, 411 U.S. at 802; Gray, 957 F.2d at 1078.  In RIF cases, this framework is inadequate with respect to the last factor.  To establish a prima facie case under the McDonnell-Douglas/Burdine pretext framework in a RIF case, the plaintiff must show he was in the protected class, he was qualified, he was laid off and other unprotected workers were retained.  Seman v. Coplay Cement Co., No. 93-3544, 1994 WL 244883, at *3 (3d Cir. June 8, 1994); Billet v. Cigna Corp., 940 F.2d 812, 816 n.3 (3d Cir. 1991); see also White v. Westinghouse Elec. Co., 862 F.2d 56, 60 (3d Cir. 1988) (same), abrogated on other grounds, Hazen Paper Co. v. Biggins, 113 S. Ct. 1701

_____

[0]Where appropriate, the analysis used in describing the evidentiary burdens in Title VII cases is also used in ADEA cases.  See, e.g., Seman v. Coplay Cement Co., No. 93-3544, at n.7 (3d Cir. June __, 1994); Duffy v. Wheeling Pittsburgh Steel Corp., 738 F.2d 1393, 1396 (3d Cir.), cert. denied, 469 U.S. 1087 (1984).

(1993).[0]  Once a plaintiff with a claim for illegal discrimination produces evidence showing these four facts, he has made out a prima facie case under the pretext framework and the defendant then has to proffer a legitimate nondiscriminatory reason for the adverse employment decision. Burdine, 450 U.S. at 253; Gray, 957 F.2d at 1078.  If the defendant presents evidence of a legitimate nondiscriminatory reason for the adverse employment decision, the presumption of discrimination drops from the case and the plaintiff must offer evidence tending to show the defendant's explanation is a pretext for discrimination. Burdine, 450 U.S. at 254-55, 257; Gray, 957 F.2d at 1078.  In an ADEA case within the pretext framework, the plaintiff has retained the burden of persuading the factfinder that age actually played a role in the adverse employment decision and had a determinative influence on the outcome.[0] Hazen, 113 S. Ct. at

_____

[0]In Mitchell v. Data General Corp., 12 F.3d 1310, 1315 (4th Cir. 1993), the United States Court of Appeals for the Fourth Circuit recently held that a plaintiff in a RIF case seeking to establish a prima facie case has to show (1) he was protected by the ADEA; (2) he was selected for discharge from a larger group of candidates; (3) his work performance was comparable to the lowest level of those retained; and (4) the RIF produced a work force containing some unprotected individuals whose work performance was lower than the plaintiff's.  The court reasoned such a prima facie requirement would zero in on age discrimination where the selection of persons to be terminated is said to be based on relative performance.  Id.
[0]Unisys argues Griffiths v. Cigna Corp., 988 F.2d 457, 472 (3d Cir. 1993) (emphasis added) requires a plaintiff in a pretext case to show "the discriminatory motive was the sole cause of the employment action."  In Miller v. Cigna Corp., No. 93-1773, 1994 WL 283269 (3d Cir. June 28, 1994), in distinguishing Griffiths and in commenting on its statement that illegal discrimination must be the "sole cause" of an employer's decision in a pretext case, we held, in light of St. Mary's, that in a pretext case "the plaintiff's burden is to show that the prohibited

21

1706; see St. Mary's, 113 S. Ct. at 2748 (plaintiff retains burden of showing discrimination was true reason for employment decision).

By contrast, in the Price Waterhouse framework in a case unaffected by the Civil Rights Act of 1991, the evidence the plaintiff produces is so revealing of discriminatory animus that it is not necessary to rely on any presumption from the prima facie case to shift the burden of production. Both the burden of production and the risk of non-persuasion are shifted to the defendant who, because of the inference the overt evidence showing the employee's bias permits, must persuade the factfinder that even if discrimination was a motivating factor in the adverse employment decision, it would have made the same employment decision regardless of its discriminatory animus. Price Waterhouse, 490 U.S. at 244-46; Griffiths v. Cigna Corp., 988 F.2d 457, 469-70 & n.12 (3d Cir. 1993).

The evidence required to establish a Price Waterhouse case was termed "direct" evidence by Justice O'Connor in her concurrence with the Price Waterhouse plurality where she said:

> [S]tray remarks in the workplace, while perhaps probative of sexual harassment, cannot justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria. Nor can statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself, suffice to satisfy the plaintiff's burden in this regard. . . . What is required is . . . direct evidence

consideration played a role in the decisionmaking process and that it was a determinative factor in the outcome of that process." Id. at *12 (footnote omitted).

> that decisionmakers placed substantial
> negative reliance on an illegitimate
> criterion in reaching their decision.

Price Waterhouse, 490 U.S. at 277 (O'Connor, J., concurring) (citation omitted).  We have said that the evidence required to come within the Price Waterhouse framework must directly reflect a discriminatory or retaliatory animus on the part of a person involved in the decisionmaking process.  Griffiths, 988 F.2d at 470; see Ostrowski v. Atlantic Mut. Ins. Cos., 968 F.2d 171, 181–82 (2d Cir. 1992) (ADEA case suggesting word "direct" may not be a precisely accurate modifier, but plainly differentiating the evidence the Price Waterhouse framework requires from the kind of circumstantial evidence needed to make out a McDonnell–Douglas/Burdine prima facie case).  Once the plaintiff has produced evidence that satisfies Price Waterhouse, as we have stated, the burden of production and the risk of non-persuasion shift to the defendant to introduce evidence showing the defendant would have made the same adverse employment decision regardless of the discrimination.  Griffiths, 988 F.2d at 469–70.[0]

In this case the district court considered whether the remarks shown on this record were "direct" evidence of intentional discrimination.  It focused on Markell's "fifty and

---

[0] Under section 107(a) of the 1991 Act, the defendant may no longer be able to completely escape liability, as he could under Price Waterhouse, by showing he would have made the same decision regardless of consideration of the discriminatory factor, but he can limit the plaintiff's remedies if he makes such a showing. See 42 U.S.C.A. § 2000e–5(g)(2) (West Supp. 1994); see also supra n.3.

fifty" comment and the documents containing information about the age and date of birth of the persons selected for transfer. It held that this evidence failed to show discriminatory animus within the Price Waterhouse framework. We agree with the district court that this evidence does not satisfy Price Waterhouse, whether we label it as direct evidence or overt evidence of discriminatory animus.

The district court first considered the "fifty and fifty" statement Markell is alleged to have made during an April 19, 1990, Unisys meeting to discuss labor costs that had been scheduled several months before Gagliardi began creating the CTS/PMO.[0] Markell resigned from Unisys in August of 1990, at least three months before the CTS/PMO transfers took place. He testified he had no connection with employment decisions regarding the CTS/PMO. Although Markell worked for Gagliardi and was a decisionmaker with respect to the hiring and firing of Unisys employees and he and Gagliardi had "lots" of contact regarding downsizing at Unisys, Jt. App. at A-695, there is no evidence connecting the "fifty and fifty" statement to Gagliardi or any other CTS/PMO decisionmaker. Indeed, Markell testified he could not remember Gagliardi making any age-related comments, although he recalled that Gagliardi frequently commented on employee positions in the Unisys corporate hierarchy, often in derogatory terms. Markell's alleged statement is not

_____

[0]During his deposition Markell did not recall this meeting nor did he recall making specific statements about people over the age of 50 making over $50,000 in salary, but he admitted he may have made general statements about levels and salaries.

24

attributable to a decisionmaker connected with the CTS/PMO employment decisions and is too remote in time from the creation of the CTS/PMO to constitute overt evidence sufficient to show Unisys had a discriminatory animus towards older employees.[0] See Price Waterhouse, 490 U.S. at 277 (O'Connor, J., concurring); cf. Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 545, 523 (3d Cir. 1992) (law firm partner's discriminatory comment to associate five years before partnership decision at issue too temporally remote and isolated to be considered evidence of discrimination in pretext case), cert. denied, 114 S. Ct. 88 (1993). "Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." Ezold, 983 F.2d at 545. Thus, the district court correctly determined Markell's statement did not constitute overt evidence of discriminatory animus.[0]

---

[0]In its district court brief opposing Unisys's motion for summary judgment, the Armbruster Group also relied on an alleged statement Perry, President of Unisys's Public Division Sector, made in late 1988 during a meeting to discuss whether to create a customer satisfaction director in each region of the Public Sector group. Perry allegedly stated at the meeting "I'm going to establish the position, but I don't want any over 50 burnouts promoted." Armbruster, 1993 WL 93975, at *9. This alleged statement was made more than two years before the creation of the CTS/PMO, and there is no evidence linking it to Unisys's employment decisions about the CTS/PMO. In any event, the Armbruster Group has not pursued this argument on appeal.
[0]The district court also correctly concluded this particular statement was inadmissible hearsay under Federal Rule of Evidence 801(d)(2)(D) and 805. Markell never identified who gave him the impression Unisys did not want to keep employees "over 50 and 50." Markell also testified that Gagliardi, to whom the Armbruster Group tries to attribute Markell's statement, never made any statements concerning employees' ages. Therefore,

25

The Armbruster Group's argument that several Unisys documents containing age notations, birth dates and/or dates of hire constitute evidence of discriminatory animus sufficient to trigger Price Waterhouse also fails.  First they refer to the memorandum dated September 30, 1990 from Haslam, chief Human Resources representative for the CTS/PMO, to Gagliardi and Donlon, Vice President of Human Resources, with a copy to Weimer.  The Haslam memorandum discusses the need either to transfer or RIF thirteen individuals, including Armbruster Group members Yanan and Kinard.  Only five of the thirteen listed individuals, including Yanan and Kinard, have age and date of hire notations handwritten next to their names.  At the bottom of the memorandum Haslam's summary notes state, "need final disposition on [Yanan and Kinard] . . . [Gagliardi] will assist in [Yanan] . . . these loose ends need to be resolved to finalize the CSD-CTS action."  Jt. App. at A-19.  None of the remaining individuals, all of whom were to be retained, had age or date of hire information written next to their names.

---

Markell's statement is inadmissible double hearsay under Federal Rule of Evidence 805.  See Carden v. Westinghouse Elec. Corp., 850 F.2d 996, 1002 (3d Cir. 1988).  Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1373 (3d Cir. 1992), cert. denied, 113 S. Ct. 1262 (1993) is distinguishable.  In Big Apple BMW, the source of the discriminatory comment was identifiable and therefore admissible as an admission under Federal Rule of Evidence 801(d)(2)(D).  Roebuck v. Drexel Univ., 852 F.2d 715 (3d Cir. 1988), another case relied on by the Armbruster Group, is also distinguishable because the discriminatory statements there came from the president of the university who had a "significant influence on the attitudes and procedures of the tenure decisionmakers."  Id. at 733.  There is no evidence in the record showing that Markell was in a similar position here.

Another document dated November 9, 1990, is a printed list entitled "Project Manager List – Atlanta." Jt. App. at A-21. The list includes the names of nineteen individuals and the dates of birth, ages, sex, EEO classifications and performance evaluations for all of them. A handwritten version of this list, created on November 6, 1990, by N. Kenneth Clark, Human Resources Manager in Atlanta, contains the same information for all but three individuals not included on the typed list.

The Armbruster Group argues that these documents containing age notations are overt evidence of discriminatory animus that satisfies Price Waterhouse and defeats a summary judgment motion. Unisys, however, has produced uncontradicted evidence that its employees routinely prepared documents listing employees' ages, dates of hire, race and sex in addition to other employment information and it insists that its employees include this information to prevent discrimination, especially during RIFs. Unisys also argues that the Haslam memorandum and Kinard's own deposition testimony reveal Kinard and Yanan were scheduled for a RIF termination in October of 1990 but were "saved" from the October RIF through Haslam's efforts and transferred into the CTS/PMO instead. The Armbruster Group concedes that companies may avoid discrimination by having their legal and human resource staff use routine employment documents containing age information but argues that in this case Unisys managers clearly used age information to make transfer and termination decisions.

The district court rejected the Armbruster Group's interpretation of the documents and instead accepted Unisys's

27

interpretation, which it supported with independent evidence, primarily in the form of testimony by its own employees. We must consider whether these documents, standing alone, are overt evidence of age discriminatory animus at Unisys in relation to the CTS/PMO.

The three cases the district court relied on to support its conclusion that mere maintenance of age information for employees is not enough to create an inference of intentional discrimination are not much help in this analysis. In them, the documents containing age notations did not relate to a RIF but instead involved a calculation of the terminated employee's severance pay or retirement benefits package. A termination resulting from an age correlated factor is not a termination because of age. See Hazen, 113 S. Ct. at 1707 (overruling White v. Westinghouse Elec. Co., 862 F.2d 56 (3d Cir. 1988) on this point).

In Wilson v. Firestone Tire & Rubber Co., 932 F.2d 510 (6th Cir. 1991), the employer decided to eliminate an employee's position in the course of a RIF. Id. at 512. The employer gave the employee four choices, one of which was taking an early retirement package. Id. at 513. The memorandum at issue was developed by the employee's supervisor before the employee's termination in order to compute what kind of severance package the employer could offer the employee if he took the early retirement package. Id. at 514. The court found no indication in the memorandum that the employee's years of service, which were noted in the memorandum as part of the computation regarding

28

severance pay, played any part in his inclusion in the RIF.  Id.
The court also held personnel documents showing employees'
birthdates and years of service were not overt evidence of
discriminatory animus, stating "the mere maintenance of such
information, absent direct evidence that it was used in making
adverse employment decisions, cannot create even a circumstantial
inference of discrimination."  Id.  Likewise, in Perry v.
Prudential-Bache Securities, Inc., 738 F. Supp. 843 (D.N.J.
1989), aff'd without opinion, 904 F.2d 696 (3d Cir.), cert.
denied, 111 S. Ct. 386 (1990), the court decided the age
notations in the document at issue were included to determine how
the employee's pension would be funded and were not evidence of
age discrimination.  Id. at 853.  Bowman v. Firestone Tire &
Rubber Co., 724 F. Supp. 493 (N.D. Ohio 1989), did not involve a
RIF.  The documents at issue, "Age Data Forms" containing name,
address, date of birth, occupation and pay information, were
required to be maintained by the federal Equal Employment
Opportunity Commission and were used daily in management
decisions.  Id. at 506.

Here, though the documents the Armbruster Group rely on
pertain to the individuals Unisys was transferring into the
CTS/PMO, we believe that they do not provide overt evidence of
discriminatory animus because none of them directly and
unequivocally indicate Unisys had a bias against older employees
from which a factfinder could directly infer that age was a
motivating factor in deciding who would be transferred into and
then terminated from the CTS/PMO.  Indeed, it is not even

29

clearly shown that all of the documents are related to the CTS/PMO transfers.

In addition, we agree with the district court that "[h]aving accurate information pertaining to the age of employees affected by a workforce restructuring readily available is essential to allow employers properly to review their employment decisions to comply with state and federal law." Armbruster, 1993 WL 93975, at *11 (citing Earley v. Champion Int'l Corp., 907 F.2d 1077, 1082 (11th Cir. 1990) ("Evaluations of the age of the work force as part of a restructuring and reduction-in-force plan are indicative of thorough business planning and are not direct evidence of discriminatory intent."). Rarely will standard employment documents, without more, constitute direct evidence of intentional discrimination. See E.E.O.C. v. MCI Int'l, Inc., 829 F. Supp. 1438, 1447 (D.N.J. 1993) ("Documents which list employees' ages, even documents which relate to a [RIF], are not per se direct evidence of discrimination and may, indeed, be innocuous. A document prepared . . . expressly for the purpose of determining [RIF candidates] with consideration given to the employees' proximity to retirement, however, is not so innocuous . . . .") (citations omitted).

We will therefore affirm that part of the district court's order granting summary judgment in favor of Unisys on the Armbruster Group's claim that the evidence in this record presents a Price Waterhouse case.[0]  Nevertheless, we think the

---

[0]We do not mean to suggest that an employee must elect to proceed on either a pretext or a Price Waterhouse theory at trial.

30

documents presented in this case contain age notations that may be related to the adverse employment decision; therefore they may be introduced as evidence of pretext, so long as they are otherwise admissible.  See Wilson, 932 F.2d at 514; see also In re Interco Inc., 152 B.R. 273, 285 (E.D. Mo. 1993) (statistical evidence coupled with handwritten document containing notations about age of employees who were to be part of RIF sufficed to establish prima facie pretext case of age discrimination).[0]

## VI.  Pretext Analysis

In Hazen, a case decided after Price Waterhouse, Justice O'Connor, writing for a unanimous Court, stated an ADEA

---

Rather, we think that an employee may present his case under both theories and the district court must then decide whether one or both theories properly apply at some point in the proceedings prior to instructing the jury.  See, e.g., Price Waterhouse, 490 U.S. at 247 n.12; id. at 278 (O'Connor, J., concurring); Griffiths, 988 F.2d at 472; see also Ostrowski, 968 F.2d at 185. While the evidence here presented to us at the summary judgment stage does not trigger the Price Waterhouse framework, the evidence presented during trial may.

[0]We note the district court in the Atlanta CTS/PMO litigation was "unpersuaded that the fact that age was included on lists of employee information is relevant circumstantial or direct evidence of discrimination."  Meeker, No. 1:92-cv-246-ODE, slip op. at 21 n.12.  It is not clear, however, that the Meeker court had before it the same documentary evidence we have because that court identifies the documentary evidence only as the Staff Adjustment Analysis and "two other lists of employees [which] include age or date of birth in addition to other information." Id. at 14.  The Meeker employees relied primarily on Markell's testimony along with statistical evidence tending to show a correlation between age and the likelihood of transfer into the Atlanta CTS/PMO.  Id. at 12, 14.  The Meeker employees also conceded that they had no overt evidence of discriminatory animus that could trigger the Price Waterhouse framework.  Id. at 11. The Meeker court ultimately concluded plaintiffs established a prima facie case of age discrimination but failed to present sufficient evidence of pretext and thus granted summary judgment to Unisys.  Id. at 26.

31

disparate treatment claim "cannot succeed unless the employee's protected trait actually played a role and had a determinative influence on the outcome." Hazen, 113 S. Ct. at 1706. The type of evidence required in a pretext case is not overt or "[e]xplicit evidence of discrimination--i.e., the 'smoking gun,'" as it is in a Price Waterhouse case. Ezold, 983 F.2d at 523; see also Griffiths, 988 F.2d at 470. Rather, what is required has been termed "circumstantial" evidence by the courts, or "'competent evidence that the presumptively valid reason[] for [the alleged unlawful employment action] [was] in fact a coverup for a . . . discriminatory decision.'" Id. (quoting McDonnell Douglas, 411 U.S. at 805). Thus, we turn to the question whether the Armbruster Group has pointed to specific evidence that shows there is a genuine issue of material fact on pretext.

In order to survive a summary judgment motion once the defendant has produced evidence of a legitimate, nondiscriminatory reason for an employment decision, a plaintiff who claims invidious discrimination but lacks overt evidence of discriminatory animus must point to evidence tending to show the defendant's explanation is pretextual since the inference arising from a prima facie case no longer exists. St. Mary's, 113 S. Ct. at 2749.[0] "A plaintiff can establish pretext in one of two ways:

---

[0]The Supreme Court's opinion in St. Mary's has caused courts and commentators to raise anew the question whether summary judgment may be granted against a plaintiff who has established a prima facie pretext case. See St. Mary's, 113 S. Ct. at 2747-49.

The two courts that our research shows have decided this issue reached opposite conclusions. Moisi v. College of Sequoias Community College Dist., 25 Cal. Rptr.2d 165, 172 (Cal. Ct. App.

32

'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered reason is unworthy of credence.'"  Ezold, 983 F.2d at 523 (quoting Burdine, 450 U.S. at 256).  The evidence of sham or pretext that Burdine requires the plaintiff to produce does not have to show directly or overtly that a discriminatory animus caused the adverse employment decision, but the plaintiff must point to some evidence from which pretext could be inferred.  As the Supreme Court stated in St. Mary's, "[t]he factfinder's disbelief of [the defendant's

---

5th Dist. 1993) decided that St. Mary's precludes summary judgment in pretext cases because of the statement that the credibility assessment of the employer's proffered reasons is for the trier of fact.  Bolton v. Scrivner, Inc., 836 F. Supp. 783 (W.D. Okla. 1993) rejects this reading of St. Mary's.  It states St. Mary's language implies only that a factfinder's refusal to believe a defendant's proffer, combined with a prima facie case, permits an inference of discrimination.  The plaintiff still bears the burden of producing evidence to show a controversy over the truth of defendant's explanation.  Id. at 791-92.

The Bolton court decided that St. Mary's does not preclude summary judgment for a defendant because it does not affect a plaintiff's obligation to produce specific evidence in support of the ultimate finding of illegal discrimination once the defendant has offered a legitimate explanation for the allegedly discriminatory act.  The Bolton court also reasoned that there is nothing in St. Mary's which specifically states the use of summary judgment in discrimination cases is disfavored and that giving St. Mary's such an interpretation would allow a plaintiff to get his case to the factfinder without producing any evidence of discrimination beyond what is necessary to establish a generic prima facie case.  Id. at 792.  The Bolton court explained: "Such a standard as the court adopts in Moisi would be much lower than the one used for civil plaintiffs in other areas of the law and would be unsupported by case law from either the Supreme Court or the federal courts of appeal."  Id. at 791-92.  We too decline to read St. Mary's as precluding summary judgment in all discrimination cases in which the plaintiff has made out a prima facie case.

explanation] may, together with the elements of the prima facie case, suffice to show intentional discrimination" because it allows the trier of fact to infer the ultimate fact of intentional discrimination. St. Mary's, 113 S. Ct. at 2749. After St. Mary's it seems clear, however, that the trier of fact cannot find for the plaintiff merely because it disbelieves the defendant's proffered explanation; it must also be persuaded that the employment decision was the result of the bias that can be inferred from the falsity of the defendant's explanation. Id.; see Seman, 1994 WL 244883, at *10 n.13. Therefore, we believe an ultimate finding of illegal discrimination in a pretext case requires evidence showing a prima facie case and evidence showing pretext. Each is necessary, and a plaintiff's proof is insufficient unless both are shown.

Considering the evidence in this record, we believe the Armbruster Group has met its summary judgment burden of pointing to admissible evidence which tends to show pretext. That evidence includes the alleged comments made by Wedean, Wells and Weimer, along with the specific documents containing age notations concerning transfers into and terminations from the CTS/PMO group. Taken together, we think this is competent evidence creating a genuine issue of material fact as to whether the Armbruster Group's transfers into and terminations from the CTS/PMO were age-related. Wedean, Wells and Weimer were all either decisionmakers or personnel immediately involved in the transfers into and/or terminations from the CTS/PMO. Their alleged comments were made contemporaneously with the transfer

34

into the CTS/PMO or within a few weeks after the RIF took effect. While we do not think that these comments are enough to show an overtly discriminatory mind set at Unisys, they cannot be disposed of as "stray remarks" on a pretext theory, and we think that the district court erred in applying Price Waterhouse's requirement of overt or direct evidence of discriminatory animus to the Armbruster Group's pretext case.[0]

If the evidence is viewed in the light most favorable to the Armbruster Group, as it should have been on summary judgment, it supports their claim of age discrimination because the evidence of remarks and age notations with specific reference to the age of persons selected for transfer tends to show Unisys's reasons for terminating the CTS/PMO transferees were pretextual, i.e. more likely motivated by illegal discrimination, when they are considered along with the Armbruster Group's other evidence of discrimination.  This other evidence includes, but is not limited to, evidence that Unisys had no business plan for the formation of the CTS/PMO and the manner in which the CTS/PMO was formed and operated.  Taken with the admissible comments concerning age that were made by persons intimately involved in the transfers, we think there is a genuine issue of material fact as to whether the Armbruster Group's members were transferred or

---

[0]We think these statements by Wedean, Wells and Weimer are admissions that fall under Federal Rule of Evidence 801(d)(2)'s exception to the hearsay rule.  They are not double hearsay like Markell's recital of what Gagliardi said.  See Carden, 850 F.2d at 1002; see also supra n.17.

35

terminated because of their age.[0]  Therefore, we will reverse the
district court's order granting summary judgment to Unisys and
remand for further proceedings.[0]

_____

[0]The district court found the Armbruster Group's theory of the
case "strains credulity." Armbruster, 1993 WL 93975, at *13. It
thought it unlikely that Unisys would go to such trouble to
terminate approximately 35 employees while it was in the midst of
terminating thousands.  Because plaintiffs have pointed to
evidence which supports their theory and is not inherently
incredible, it is not our place, nor the district court's, to
make such a credibility determination on a motion for summary
judgment.  "When deciding a motion for summary judgment . . . a
court's role remains circumscribed in that it is inappropriate
for a court to resolve factual disputes and to make credibility
determinations." Big Apple, 974 F.2d at 1363.  The Court's role
is to decide whether the plaintiff has set forth specific facts
showing a genuine issue of material fact for trial. Id.  We
think the Armbruster Group has produced evidence of pretext
sufficient to do so at the present stage of these proceedings.

    We also note that the district court did not consider the
allegedly discriminatory statements, the Haslam memorandum or the
other CTS/PMO documents containing age references in determining
whether the Armbruster Group presented evidence sufficient to
withstand a motion for summary judgment in a pretext case.  So
long as these pieces of evidence are otherwise admissible, they
should be considered as part of the Armbruster Group's pretext
case at trial.

    Likewise, the Armbruster Group's evidence may be relevant to
show Unisys's explanation for their selection for and termination
from the CTS/PMO was pretextual.  Further development of this
record, however, may show that the references to employees "over
50 and 50" indicates no more than Unisys's desire to reduce its
pension costs. See, e.g., Hazen, 113 S. Ct. at 1707 (holding
employer does not violate ADEA by firing employee before his
pension based on years of service vested, but leaving open
possibility that employer who targets employees with particular
status on assumption that these employees are likely to be older
thereby engages in age discrimination).
[0]Because the district court, despite misgivings, permitted the
parties to proceed on a stipulation that plaintiffs have shown a
prima facie case and the existence of a prima facie case is also
assumed in their appellate briefing, we have considered only the
question whether the Armbruster Group has introduced evidence
showing Unisys's proffered explanation for the termination of its

The Armbruster Group also contends that Unisys discriminated against them when it selected them for transfer into and termination from the CTS/PMO group.  In its opinion, the district court addressed only the Armbruster Group's termination from the CTS/PMO.  On remand we think the district court may also need to consider the evidence in this record concerning the Armbruster Group's selection for transfer into the CTS/PMO.  It may also be of some significance that the SMG group apparently remained separate from the CTS/PMO transferees at all times.

## VII.  Conclusion

We will affirm in part the order of the district court granting summary judgment as to the Armbruster Group's ERISA claim, vacate the order granting summary judgment on the Armbruster Group's ADEA claim and remand for further proceedings consistent with this opinion.

---

members was either likely motivated by discrimination or unworthy of belief and that discrimination was the true reason for such action.  We do not reach the issue of whether the Armbruster Group established a proper prima facie case.  But see Maxfield v. Sinclair, 766 F.2d 788, 792–93 (3d Cir. 1985), cert. denied, 474 U.S. 1057 (1986).

37