USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit
 ____________________

No. 97-1048

 DR. MARJORIE C. MCMILLAN,
 
 Plaintiff, Appellee,
 
 v.
 
 MASSACHUSETTS SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS, AND
 DR. GUS THORNTON,
 
 Defendants, Appellants.
 
 _____________________
 
No. 97-1174

 DR. MARJORIE C. MCMILLAN
 
 Plaintiff, Appellant,
 
 v.
 
 MASSACHUSETTS SOCIETY FOR THE PREVENTION OF CRUELTY TO 
 ANIMALS, DR. GUS THORNTON AND DR. PAUL GAMBARDELLA,
 
 Defendants, Appellees.
 ____________________
 
 APPEALS FROM THE UNITED STATES DISTRICT COURT
 
 FOR THE DISTRICT OF MASSACHUSETTS
 
 [Hon. Richard G. Stearns, U.S. District Judge] 
 ____________________
 
 Before
 
 Stahl, Circuit Judge,
 Godbold,* Senior Circuit Judge,
 and Cyr, Senior Circuit Judge.
 ____________________
 
 Marcus E. Cohn with whom Melissa Bayer Tearney and Peabody & Brownwere on brief for defendants.
 Dahlia C. Rudavsky with whom James S. Weliky and Messing & Rudavsky,
P.C. were on brief for plaintiff.

 ____________________

 March 18, 1998
 ____________________
 
 
 
 
 
 
 _____________________
 *Of the Eleventh Circuit, sitting by designation. STAHL, Circuit Judge. In the late 1980s, Dr. Marjorie
 McMillan, head of the radiology department for the
 Massachusetts Society for the Prevention of Cruelty to
 Animals ("MSPCA"), learned that she was being paid less than
 the male heads of the organization's other departments. 
 Defendants MSPCA and Dr. Gus Thornton now appeal the district
 court's denial of their motion to set aside verdicts in Dr.
 McMillan's favor on her various pay discrimination claims. 
 They also appeal as excessive the jury's award of
 compensatory and punitive damages, and the district court's
 award of attorney's fees. Dr. McMillan cross-appeals the
 court's grant of judgment as a matter of law on her tortious
 interference with contractual relations claim against
 defendant Dr. Paul Gambardella, and its grant of summary
 judgment on her contract claims against the MSPCA and on her
 retaliation claim against all three defendants. We affirm
 the district court's ruling on the pay discrimination,
 tortious interference, contract, and retaliation claims, and,
 in part, the jury's compensatory damages verdict; reverse the
 award of punitive damages and compensatory damages
 representing lost benefits; and vacate the award of
 attorney's fees with directions that it be recalculated after
 remand.
 I.
 BACKGROUND AND PRIOR PROCEEDINGS
 We begin with an overview of general facts and prior
 proceedings, and leave more detailed recitations to the
 appropriate contexts.
 Defendant MSPCA is a charitable, non-profit organization that
 combats cruelty to animals through educational programs and
 veterinary services. It operates Angell Memorial Animal
 Hospital ("Angell"), whose staff, during the relevant time
 period, totalled more than 200 employees, including
 veterinarians, interns, residents in post-graduate veterinary
 training, and technical and support staff. Defendant Dr. Gus
 Thornton began working at Angell in 1957, and was its chief
 of staff from 1966 until 1989, at which time he became
 president of the MSPCA. Defendant Dr. Paul Gambardella
 worked as a staff surgeon at Angell from 1975 until 1984, and
 as the interim director of surgery from 1984 until 1989, when
 Dr. Thornton appointed him chief of staff.
 Plaintiff Dr. Marjorie McMillan was first employed by Angell
 in 1969 and thereafter was employed in various capacities
 until she left in 1977 to work in private practice. She
 returned in 1981 as the director of the radiology department,
 employed part time. She left Angell again in 1984 to spend
 one year completing coursework necessary for board
 certification and returned to Angell in 1985, again as
 director of radiology on a part-time schedule. From 1987
 until 1991, she worked full time as head of radiology. In
 addition, from 1981 to 1991, she worked approximately seven
 hours each week at Windhover Bird Clinic ("Windhover"), a
 part-time private avian practice that she had established in
 Walpole, Massachusetts.
 Until 1988, Angell had seven veterinary departments: clinics,
 cardiology, intensive care, clinical pathology, pathology,
 surgery, and radiology. All of the departments were headed
 by veterinarians, who, in addition to fulfilling their
 clinical duties, also served as administrative directors of
 their departments. During this time, Dr. Thornton was
 responsible for negotiating veterinarians' initial salaries
 and for setting discretionary annual increases from a fixed
 amount of funds. Although the department directors were
 responsible for such tasks as purchasing equipment, training
 interns and residents, scheduling, and making budget and
 compensation recommendations to Dr. Thornton, all of the
 staff reported to Dr. Thornton rather than to the individual
 directors.
 In 1985 Dr. Thornton initiated a plan to restructure Angell's
 management, giving to the department directors greater
 responsibility, including the authority to make hiring,
 firing, compensation, and discipline decisions. As part of
 the reorganization, Dr. Thornton in 1988 consolidated
 Angell's seven departments into four departments: radiology,
 medicine, surgery, and pathology.
 Dr. McMillan did not know the salaries of other veterinarians
 employed by Angell until 1987, when she learned that the
 salary of a newly-hired radiologist was $38,000. Dr.
 McMillan, whose salary at that time was $41,000, consulted
 Dr. Thornton and requested a raise so that her compensation
 would be comparable to that of the other department heads. 
 Dr. Thornton eventually offered Dr. McMillan a raise to
 $47,000, which she did not accept because she had been
 offered a $50,000 salary for a non-administrative veterinary
 position at Tufts University Veterinary School. Dr. Thornton
 then agreed to adjust Dr. McMillan's salary to $51,000,
 effective in January 1988.
 In 1989, Dr. McMillan discovered the disparity between her
 salary and that of the other department heads at Angell when
 a newspaper published a letter about the MSPCA that listed
 the various salaries. At the time, her salary was $58,000;
 her male counterparts in surgery, pathology, and medicine, by
 contrast, were earning $73,000, $80,244, and $73,199,
 respectively. On the basis of the salary disparity, Dr.
 McMillan filed a complaint with the Massachusetts Commission
 Against Discrimination.
 Also in 1989, Dr. Gambardella, who became chief of staff
 upon Dr. Thornton's accession to the MSPCA presidency, set
 out to reevaluate and to improve the level of department
 heads' compensation. He began by creating job descriptions
 for each of the department heads in which the list of duties
 for the head of radiology was substantially the same as those
 for the other department head positions. He also consulted a
 study of the salaries at another major animal hospital and an
 informal market survey, on the basis of which he tentatively
 suggested to Kathleen Collins, Angell's human resources
 director, that the heads of radiology and surgery receive
 $88,000, the head of medicine, $90,000, and the head of
 pathology, $95,000. Collins then undertook an analysis of
 the department head jobs in order to "rationalize" the
 MSPCA's salary structure, giving a range of points in a
 number of categories of responsibility. On the basis of the
 point totals, she determined an appropriate salary for each
 of the department heads. On completion of the analysis, in
 1990, Dr. McMillan received a raise from $58,295 to $72,000,
 which was substantially larger than that received by any of
 the other department heads. 
 Also in 1990, Dr. McMillan entered into negotiations with
 Angell over the status of Windhover. Dr. McMillan suggested
 that Angell acquire her practice or, alternatively, that it
 rent her space so that she could carry on her bird practice
 there or that it pay her a separate, additional amount for
 her treatment of Angell's avian patients. When the
 negotiations came to an impasse, Dr. McMillan refused to
 continue to treat birds at Angell, a duty to which she had
 been devoting approximately six hours per week.
 In 1991, Dr. Gambardella began to receive complaints from
 veterinarians -- other department heads and members of the
 surgery staff, in particular -- that Dr. McMillan was
 uncooperative and had created an atmosphere of animosity and
 inflexibility in the radiology department. On November 21,
 1991, Dr. Gambardella summoned Dr. McMillan as she was
 preparing to perform a procedure on an anesthetized dog,
 fired her, gave her fifteen minutes to gather her belongings,
 and had her escorted out of the hospital. She was told not
 to return and was thereafter excluded from the premises. 
 Although Angell had adopted in March 1990 a discipline policy
 directed at the correction of inappropriate behavior and
 retention of employees whenever possible, Dr. McMillan was
 given no advance warning of her termination.
 On May 21, 1992, Dr. McMillan sued the MSPCA, Dr. Thornton,
 and Dr. Gambardella, alleging pay discrimination in violation
 of Title VII, 42 U.S.C. 2000e-1; the Equal Pay Act ("EPA"),
 29 U.S.C. 206; and the Massachusetts anti-discrimination
 statute, Mass. Gen. Laws ch. 151B, and Equal Rights Act,
 Mass. Gen. Laws ch. 93, 102. The complaint also alleged
 retaliation in violation of Title VII, the EPA, and Mass.
 Gen. Laws ch. 151B and ch. 272, 92A and 98; breach of
 contract and negligent performance of contractual duties
 against the MSPCA; and tortious interference with contractual
 relations against Dr. Thornton and Dr. Gambardella. On March
 17, 1995, the district court awarded the MSPCA summary
 judgment on Dr. McMillan's claims for pay discrimination
 under Title VII and Mass. Gen. Laws ch. 93, 102,
 retaliation under state and federal law, breach of contract
 and negligent performance of contractual duties, and tortious
 interference with contractual relations against Dr. Thornton. 
 The court also held that damages against the MSPCA were
 limited to $20,000, pursuant to the Massachusetts charitable
 immunity law, Mass. Gen. Laws ch. 231, 85K. The court
 later held that chapter 231 did not apply and granted Dr.
 McMillan's motion for reconsideration of the limitation on
 damages.
 In December 1995, plaintiff tried to a jury the remaining
 counts: pay discrimination in violation of the EPA against
 the MSPCA and in violation of Mass. Gen. Laws ch. 151B
 against the MSPCA and Dr. Thornton, and tortious interference
 with contractual relations against Dr. Gambardella. The jury
 found in her favor on all counts. On Dr. McMillan's pay
 discrimination claim under Mass. Gen. Laws ch. 151B, the jury
 awarded $183,784.50 as back pay accrued from 1985 through
 1991, to which it added $178,915 for interest accrued from
 1985. On her tortious interference claim against Dr.
 Gambardella, it awarded $197,550 as back pay, adding
 $84,846.50 as interest and $99,375.23 as front pay. Finally,
 the jury assessed punitive damages against Dr. Thornton and
 the MSPCA in the amount of $306,912.50. On November 12,
 1996, the court awarded Dr. McMillan $447,928.81 in
 attorney's fees and $18,889 in costs. On the same day, the
 trial court set aside the jury verdict on the tortious
 interference claim against Dr. Gambardella but declined to
 set aside or grant a new trial on the pay discrimination
 verdict or award of back pay and punitive damages. This
 appeal and cross-appeal followed.
 II.
 DISCUSSION
 A. Pay Discrimination
 The MSPCA and Dr. Thornton contend that the trial court erred
 by denying their Fed. R. Civ. P. 50(b) motion for judgment as
 a matter of law, thereby ruling that there was sufficient
 evidence for a reasonable jury to find that they
 intentionally discriminated against Dr. McMillan, on the
 basis of her sex, in setting her salary between 1985 and
 1991. They first argue that the evidence was insufficient to
 show that Dr. McMillan's skills, efforts, and
 responsibilities as a radiologist and department head were
 substantially similar to those of the male department heads. 
 The remainder of their argument addresses the issue of
 pretext. Focusing on evidentiary questions, defendants
 contend that the trial court erred by admitting Dr.
 Gambardella's preliminary suggestions about appropriate
 department head salaries, and sporadic comments derogatory to
 women made by Dr. Thornton, as evidence that the reasons
 provided by Dr. Thornton for the pay disparity were
 pretextual. They further assert that there was insufficient
 evidence that Dr. Thornton's stated reasons for his
 determinations of base salaries and annual salary increases
 were pretextual. Specifically, they contend that a
 statistical analysis used to show pay differentials between
 males and females at the MSPCA could not support the verdict,
 and that Dr. Thornton's "stray remarks" were insufficient to
 expose as pretextual his purported method of establishing and
 raising salaries. 
 Defendants challenge the pay discrimination verdicts under
 both state and federal discrimination law. To establish a
 prima facie case of sex discrimination based on salary
 disparity under the federal Equal Pay Act, a plaintiff must
 show that her employer was subject to the Act, and that she
 was paid less than her male counterparts who were performing
 work requiring substantially equal skill, effort, and
 responsibility under similar working conditions. Defendants
 must then prove by a preponderance of the evidence that the
 pay disparity can be explained by a legitimate factor such as
 seniority or performance. See Corning Glass Works v.
 Brennan, 417 U.S. 188, 195-96 (1974); Timmer v. Michigan
 Dep't of Commerce, 104 F.3d 833, 843 (6th Cir. 1997). Thus,
 in cases brought under the Equal Pay Act, the plaintiff need
 not show that the defendant was motivated by a discriminatory
 animus, as required in cases governed by the McDonnell-
 Burdine burden shifting framework.
 Under Massachusetts law, after a plaintiff presents her prima
 facie case, the requirements of which are the same as under
 federal law, see, e.g., Petsch-Schmid v. Boston Edison Co.,
 914 F. Supp. 697, 706-07 (D. Mass. 1996), there is a
 rebuttable presumption of intentional discrimination, seeBlare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass.
 437, 441 (1995). The defendant then has the burden of
 producing evidence of a legitimate, non-discriminatory reason
 for the pay disparity. See id. at 441-42. After the
 defendant has satisfied this burden, the presumption of
 intentional discrimination disappears, see id. at 442, and
 plaintiff assumes the burden of proving, by a preponderance
 of the evidence, that the defendant's stated reasons for the
 pay disparity were not the real reasons, see id. at 444-45. 
 We review de novo a trial court's decision to deny or to
 grant a defendant's motion for judgment as a matter of law. 
 See Morrison v. Carleton Woolen Mills, Inc., 108 F.3d 429,
 436 (1st Cir. 1997). The standard of review for motions for
 judgment as a matter of law requires us to view the evidence
 "in the light most favorable to the nonmoving party, drawing
 all reasonable inferences in its favor." Id. We will not
 set aside a jury verdict as a matter of law unless there was
 only one conclusion the jury could have reached. See Conwayv. Electro Switch Corp., 825 F.2d 593, 598 (1st Cir. 1987).
 1. Prima Facie Case
 We agree with the district court that a reasonable jury could
 have found that Dr. McMillan had satisfied her burden of
 establishing a prima facie case of pay discrimination. 
 Contrary to defendants' assertion that plaintiff failed to
 offer evidence comparing the skill, effort, and
 responsibilities of her position as radiology department head
 with that of the other department heads, plaintiff proffered
 testimony that the radiology department is comparable with
 the other departments in all three respects. In particular,
 testimony from Dr. Neil Harpster, Angell's cardiology
 department head from 1985 to 1988, and Dr. Allen Sisson, a
 staff veterinarian, provided evidence both that the
 procedures performed by Dr. McMillan in her job were among
 the most technically difficult procedures performed by any
 veterinarian at Angell and that the hours Dr. McMillan spent
 at her job were comparable to those of the other department
 heads. In addition, the evidence showed that Dr. McMillan
 supervised more staff than did Dr. James Carpenter, the head
 of the pathology department, and that, in Kathleen Collins's
 analysis of department head jobs in the late 1980s, radiology
 was ranked equally with pathology and medicine in seven out
 of eight categories of responsibility. Moreover, although
 the job descriptions that Dr. Gambardella formulated in 1989,
 without more, are not dispositive, the fact that the job
 requirements for all of the department heads were
 substantially the same is supportive of other evidence that
 the department head positions required substantially equal
 skill, effort, and responsibility. Finally, a market survey
 published sometime in the first half of the 1980s and
 admitted into evidence demonstrated that the average salaries
 of radiologists were comparable to those of other
 specialists, indicating that radiology is not an
 intrinsically less demanding area of veterinary medicine. 
 The evidence was thus sufficient to support a finding that
 plaintiff had presented a prima facie case.
 2. Pretext
 We turn next to the issue of pretext. At trial, defendants
 presented several reasons to explain why Dr. McMillan was
 paid less than the other department heads. Dr. Thornton
 testified that, as chief of staff, he set a department head's
 compensation by conducting an informal survey of what
 similarly situated veterinarians were being paid at other
 institutions and by negotiating compensation with the
 prospective department head. He stated that, in general,
 radiologists commanded lower compensation than did
 veterinarians in other specialties. He further testified
 that, to determine yearly percentage salary increases, he
 evaluated each department head's productivity and
 responsibilities. Dr. Thornton stated that, in his view, the
 head of medicine, Dr. Michael Bernstein, had significantly
 more responsibilities, including the oversight of more staff,
 than did Dr. McMillan as head of radiology. Dr. Thornton
 likewise claimed that the head of pathology, Dr. Carpenter,
 had more responsibilities than did Dr. McMillan because he
 supervised more staff, had a larger budget, and was
 nationally known, and because pathology, unlike radiology,
 incorporated several disciplines such as clinical and
 anatomic pathology. The head of surgery, Dr. Gambardella at
 the time, merited greater compensation in Dr. Thornton's view
 because he was accountable for the budget and staff hiring
 and discipline for the department, supervised more staff, and
 had significant responsibility for patient care and client
 contact.
 Defendants make two primary arguments regarding the pretext
 prong of plaintiff's pay discrimination claim. First, they
 argue that the jury's findings that Dr. Thornton's
 explanations were pretextual are tainted because the district
 court improperly admitted into evidence (1) Dr. Gambardella's
 preliminary suggestions in 1989 regarding salary increases as
 proof of Dr. Thornton's state of mind throughout the time
 period that he set Dr. McMillan's salary and yearly
 increases, and (2) evidence of sporadic distasteful remarks
 that Dr. Thornton made to women colleagues in 1979 and 1989. 
 Second, defendants assert, in essence, that, even taking into
 account all of the evidence actually admitted, plaintiff
 failed to prove, as required under Massachusetts law, that
 Dr. Thornton's stated procedures for setting salaries were
 pretextual.
 We review a district court's evidentiary rulings for abuse of
 discretion. See United States v. Young, 105 F.2d 1, 8 (1st
 Cir. 1997). A judge should not exclude relevant evidence,
 unless its probative value is substantially outweighed by the
 danger of unfair prejudice. See Fed. R. Evid. 403. "Only
 rarely -- and in extraordinarily compelling circumstances --
 will we, from the vista of a cold appellate record, reverse a
 district court's on-the-spot judgment concerning the relative
 weighing of probative value and unfair effect." Freeman v.
 Package Mach. Co., 865 F.2d 1331, 1340 (1st Cir. 1988).
 The court's admission of testimony about Dr. Gambardella's
 1989 suggestions regarding salary increases was not an abuse
 of its discretion. One of Dr. Thornton's stated reasons for
 setting salaries at Angell as he did during the period from
 1985 to 1989 was that radiologists commanded lower salaries
 on the market than did veterinarians in other specialties. 
 The issue was whether this reason was pretextual. The
 informal 1989 survey on which Dr. Gambardella based his
 suggestions showed relative parity among salaries of
 radiologists and other specialists. Accordingly, Dr.
 Gambardella's suggestions were probative of whether radiology
 is intrinsically a less-valued veterinary specialty and,
 therefore, of whether Dr. Thornton's stated reason was, in
 fact, the real reason. They are probative also of Dr.
 Thornton's credibility because they were based on what
 veterinarians in various specialties were worth in the
 market, the very factor on which Dr. Thornton purported to
 rely in setting salaries at Angell. Further, although
 defendants contend that, regardless of the status of
 radiology at other institutions, the radiology department at
 Angell was not equal to Angell's other departments with
 regard to the responsibilities required of its head, we think
 that the district court did not abuse its discretion in
 determining that Dr. Gambardella's testimony regarding salary
 parity at other institutions was not unfairly prejudicial to
 defendants in their attempt to make this point.
 Whether the court's admission into evidence of the so-called
 stray remarks was proper presents a more difficult question. 
 There is, of course, no question that Dr. Thornton's
 motivation in paying Dr. McMillan less than the other
 department heads was a material issue in the case. We note
 initially that stray remarks may properly constitute evidence
 of discriminatory intent for the jury to consider in
 combination with other evidence. See Bevan v. Honeywell,
 Inc., 118 F.3d 603, 610 (8th Cir. 1997); O'Connor v. DePaul
 Univ., 123 F.3d 665, 671-72 (7th Cir. 1997) ("'[S]tray
 remarks' -- made by the decisionmaker but not related to the
 disputed employment action -- may be relevant to the question
 of pretext . . . ."). Yet even if the remarks are relevant
 for the pretext inquiry, their probativeness is circumscribed
 if they were made in a situation temporally remote from the
 date of the employment decision, see Armbruster v. Unisys
 Corp., 32 F.3d 768, 779 (3d Cir. 1994), or if they were not
 related to the employment decision in question or were made
 by nondecisionmakers, see, e.g., Ezold v. Wolf, Block, Schorr
 & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992) ("Stray
 remarks by non-decisionmakers or by decisionmakers unrelated
 to the decision process are rarely given great weight . . .
 .").
 The allegations in this case are that, during his time at
 Angell, Dr. Thornton made various unprofessional remarks to
 women with whom he worked. In 1979 or 1980, he talked to a
 lab technician about warming up a vial of medicine in her
 brassiere. Approximately ten years later, he made a remark
 to the MSPCA's lobbyist about her cleavage and then later
 asked whether, to stop bad publicity about the MSPCA by a
 particular reporter, she had slept with the reporter. 
 Arguably, at least, these remarks may have been relevant and
 probative as to Dr. Thornton's motivation in setting the
 salaries of male and female department heads, in the sense
 that they evince a derogatory attitude toward women.
 However, not only did the remarks not involve the employment
 decision at issue, they did not involve employment at all. 
 Further, at least one of the remarks was made several years
 before any dispute arose over the pay disparity between Dr.
 McMillan and other department heads. Such factors heighten
 the remoteness of the remarks, arguably to the point at which
 they are no more probative than they are prejudicial. 
 Nonetheless, the question we must address in determining
 admissibility is not whether we agree with the district court
 but, rather, whether the district court abused its
 discretion. See Espeaignnette v. Gene Tierney Co., Inc., 43
 F.3d 1, 8 (1st Cir. 1994). We think that it did not. 
 Although the comments were unrelated to Dr. McMillan's
 situation, and although the remarks may, in the end, have
 fallen on the other side of the imprecise nexus/no-nexus
 boundary, the court's determination to admit the remarks for
 the jury to consider with the other evidence was not so one-
 sided such that it did not act within its discretion. 
 Defendants contend in addition that the district court erred
 by giving the jury an improper instruction on the relevance
 of Dr. Thornton's remarks. They assert that the court both
 analyzed and added to the evidence by equating Dr. Thornton's
 remarks with his attitude about the value of women when no
 evidentiary foundation supplied the nexus. Further, they
 argue that the instruction misled the jury to believe that
 stray remarks alone were sufficient evidence of pretext.
 Defendants' objections to the jury instructions were not
 clearly articulated at trial and, therefore, not properly
 preserved. In such a situation, we review only for error
 resulting in a "clear miscarriage of justice." Transnational
 Corp. v. Rodio & Ursillo, Ltd., 920 F.2d 1066, 1069 (1st Cir.
 1990).
 In reviewing jury instructions such as these, we focus
 principally on "whether they tended to confuse or mislead the
 jury on the controlling issues." Service Merchandise Co.,
 Inc. v. Boyd Corp., 722 F.2d 945, 950 (1st Cir. 1983). In
 this instance, we discern no problems with the judge's stray
 remarks instructions. First, contrary to defendants'
 suggestion, federal judges may comment on the evidence. SeeLeshore v. County of Worcester, 945 F.2d 471, 474 (1st Cir.
 1991). Second, in this case the judge merely made explicit
 what the jury might infer if it chose to credit the stray
 remarks. This may be, as defendants assert, "connect[ing]
 the dots," but it is not a suggestion that a particular
 conclusion must be reached. Moreover, the court made clear
 to the jury that it was equally plausible to regard the
 remarks as "random and completely out of character," and thus
 to infer nothing at all about them. Likewise, the
 instructions in no way misled the jury to believe that the
 stray remarks might, alone, be sufficient to prove that
 defendants' stated reasons for paying Dr. McMillan less were
 mere pretext. That the jury "might decide that a given
 remark is evidence of a discriminatory mindset" seems to us
 to be nothing other than a restatement of why such evidence
 is presented to the jury in the first place; it implies
 nothing about how much or how little of such evidence is
 sufficient for the jury to find in the plaintiff's favor. In
 any event, the instructions did not result in a "clear
 miscarriage of justice."
 As to the sufficiency of the evidence of pretext, defendants
 attack the analysis of plaintiff's statistical expert, Dr.
 Arlene Ash. They argue that the analysis cannot support the
 jury verdict because it did not incorporate variables that
 Dr. Thornton argued he applied when he set initial salaries
 and determined annual incremental increases. They also
 contend that it was based on a legally insufficient sample
 size.
 We turn first to the argument that Dr. Ash's analysis ignored
 important factors. Defendants assert that Dr. Ash's model
 should have included such variables as market factors,
 negotiations, veterinary experience, performance evaluations,
 productivity, and veterinarians' overall contribution to the
 hospital. As a preliminary matter we note that, although a
 failure to include particular variables in a regression
 analysis may diminish the probativeness of the analysis, "it
 can hardly be said, absent some other infirmity, that an
 analysis which accounts for the major factors . . . 'must be
 considered unacceptable as evidence of discrimination.'" SeeBazemore v. Friday, 478 U.S. 385, 400 (1986). Dr. Ash
 incorporated into the analysis such legitimate variables as
 veterinarians' seniority at Angell, department head status,
 board-approved specialization, area of specialization, and
 departmental budget size. Although the models she developed
 may not have included every relevant variable, her testimony
 shows solid reasoning in her determinations to exclude
 certain variables that the defendants argued should have been
 included. We therefore reject this argument.
 Defendants further assert that Dr. Ash's analysis was
 effectively based on an insufficient sample size because Dr.
 Ash used factors which could apply only to department heads. 
 This objection is opaque and unpersuasive. Dr. Ash's choice
 of sample, which was the approximately forty-six
 veterinarians who worked at Angell from 1981 to 1991, was not
 fatally deficient. The analysis made a distinction between
 those veterinarians who were department heads and those who
 were not. Only one variable -- budget size -- was specific
 to department head status, and it was not applied to the
 veterinarians who were not department heads.
 Defendants continue, however, arguing that statistical
 evidence "should rarely be accorded any weight" in disparate
 treatment cases. We agree that in a disparate treatment
 case, such as this one, the necessary focus on the treatment
 of a particular individual appears incongruous with an
 analysis that necessarily involves numerous individuals and
 that, therefore, is intuitively more probative in the
 disparate impact context. See LeBlanc v. Great Am. Ins. Co.,
 6 F.3d 836, 848 (1st Cir. 1993); Cumpiano v. Banco Santander
 P.R., 902 F.2d 148, 156 (1st Cir. 1990). Nonetheless, such
 analyses are admissible even in disparate treatment cases
 unless they are "so incomplete as to be inadmissible as
 irrelevant." See Bazemore, 478 U.S. at 400 n.10. Further,
 we have held that "[s]tatistical evidence is permissible on
 the issue of pretext in a disparate treatment case since
 'statistics as to . . . employment policy and practice may be
 helpful to a determination of whether [the employer's
 conduct] conformed to a general pattern of discrimination.'" 
 Freeman, 865 F.2d at 1342 (quoting McDonnell Douglas Corp. v.
 Green, 411 U.S. 792, 805 (1973)). We agree with the court
 below that, in a case such as this, "the jury could have
 found a plausible connection between Dr. Thornton's treatment
 of women generally at Angell and his treatment of Dr.
 McMillan in particular."
 Leaving aside whether Dr. Ash's analysis was watertight in
 all respects, we think it important to note that Dr. Ash's
 testimony was focused, perceptive, and understandably
 compelling to the jury. Reviewing the record, it is apparent
 to us that, whatever "infirmities" existed in her analysis,
 none was so substantive that no reasonable jury could have
 relied on it, along with the other evidence, in reaching a
 verdict. Rather, if Dr. Ash's analysis omitted what
 defendants argue are important variables, or was deficient in
 other respects, and thereby did not reflect whether Dr.
 Thornton's salary decisions were based at least in part on
 gender, it was up to defendants to exploit and discredit the
 analysis during cross examination. Furthermore, although the
 conflicting expert testimony they provided placed Dr. Ash's
 analysis into question, the jury was free to disregard that
 testimony and place credence in that of Dr. Ash. Indeed, as
 the district court noted, although the defendants' expert,
 Dr. Herbert Weisberg, disputed Dr. Ash's finding of a pattern
 of discrimination, he admitted that her model had produced
 statistically significant results. 
 In arguing that plaintiff did not show evidence of pretext,
 Defendants' position seems to be that, aside from evidence of
 Dr. Thornton's stray remarks and Dr. Ash's statistical
 analysis, there remains no basis on which the jury might
 reasonably have found pretext under Massachusetts law and pay
 discrimination under the EPA. But in addition to the
 statistical analysis, plaintiff offered other evidence,
 which, in combination with the statistical evidence, was
 sufficient to support a finding of pretext. Although
 defendants posited that the radiology department was smaller
 than the other departments, plaintiff presented evidence
 that, in fact, cardiology was the smallest department, with
 only two employees under the supervision of the department
 head. The record reveals that the issue of seniority
 provided an additional basis for a jury finding of pretext. 
 Dr. Thornton testified that both the number of years a
 veterinarian had been in practice and his or her seniority at
 Angell were factors he weighed in setting initial salaries
 for a particular position. And, indeed, it appears from the
 evidence that he did consider seniority in setting the
 salaries of Dr. Gambardella when he became head of surgery
 and of Dr. Michael Aronsohn when he succeeded Dr. Gambardella
 in that position. Dr. Thornton's testimony indicates,
 however, that he ignored seniority and years in practice in
 the case of Dr. McMillan, treating her as a new hire when she
 returned to Angell in 1985. The testimony shows that, even
 though Dr. McMillan in 1985 had spent two and a half years as
 radiology department director (albeit part time) and five
 years at Angell in various capacities, Dr. Thornton did not
 consider that experience in setting her salary. Rather, he
 testified that he based her salary on a survey that
 recommended $29,000 to $50,000 for the least experienced
 radiologists, and that, in fact, he paid her $35,000 simply
 because he could. But $35,000 was essentially the same
 salary Dr. McMillan had been earning in 1983, before she
 spent a year away from Angell. As for annual percentage
 increases of salaries, although Dr. Thornton testified that
 he based his decisions on subjective factors such as
 productivity, contribution to the hospital, and interaction
 with other employees, he also testified that he did not
 systematically quantify contributions and interaction and
 that he did not evaluate the radiology department on the
 basis of productivity. Finally, testimony from Dr. Bernstein
 and Dr. Aronsohn placed into question Dr. Thornton's
 assertion that some department heads were so-called "strong
 department heads," and had more authority on that basis. 
 Thus, a reasonable jury could have found that Dr. Thornton's
 stated reason for his salary decisions was not true or, in
 other words, pretextual.
 Accordingly, because we think that there was sufficient
 properly admitted evidence for a jury to find that Dr.
 Thornton's stated reasons for the pay disparity were
 pretextual, we choose not to disturb the district court's
 denial of judgment as a matter of law with regard to the pay
 discrimination claims based on Mass. Gen. Laws ch. 151B and
 on the Equal Pay Act. 
 B. Damages
 Defendants present a variety of arguments regarding
 calculation of damages, most of which need not detain us
 long. At the outset, we note that we do not disturb a jury's
 award of damages unless it "exceed[s] any rational appraisal
 or estimate" of what the damages should be. Kolb v.
 Goldring, Inc., 694 F.2d 869, 871 (1st Cir. 1982) (internal
 citation omitted).
 Defendants argue that Dr. McMillan's back pay damages award
 should be set aside or reduced because the award was
 excessive and unsupported by the evidence. They contend that
 the jury's award of back pay based on an average of the
 salaries of the male department heads between 1985 and 1991
 has no legal basis. We disagree. As Dr. McMillan rightly
 points out, the cases defendants rely on to support their
 argument, Scarfo v. Cabletron Sys., Inc., 54 F.3d 931, 954
 (1st Cir. 1995) and E.E.O.C. v. Liggett & Myers, Inc., 690
 F.2d 1072, 1075 (4th Cir. 1982), are inapplicable in this
 situation, and, if anything, serve to support rather than to
 discredit the averaging method. In Liggett & Myers, the
 court rejected a calculation of back pay based on the average
 salary in favor of a calculation based on the salary of the
 highest paid employee comparator. See 690 F.2d at 1074. 
 Although Scarfo holds that back pay should be calculated by
 comparing the plaintiff's salary to that of "arguably
 equivalent" employees, it in no way indicates that averaging
 the salaries of two or more such employees is inappropriate. 
 See 54 F.3d at 954. Here, averaging the salaries of the male
 department heads was a rational approach. In fact, in this
 context, a more appropriate method has not been proposed. We
 thus find that the method the jury apparently used to
 determine the amount of the back pay award was not
 inappropriate.
 Defendants next assert that Dr. McMillan is not entitled to
 recovery, as part of her back pay award, for "lost benefits"
 -- health insurance, life insurance, and retirement
 contributions -- because she did not prove that she had lost
 them. Plaintiff testified that she had been told that such
 benefits constituted twenty-one percent of an employee's
 salary and that, in her capacity as department head, she
 budgeted twenty-one percent of her supervisees' salaries as
 benefits. On this basis, the jury awarded Dr. McMillan an
 additional twenty-one percent of her back pay award to
 represent the value of the lost benefits.
 Lost benefits are recoverable only if the plaintiff has
 offered evidence of out-of-pocket expenses for the same
 benefits. See Kossman v. Calumet County, 800 F.2d 697, 703-
 04 (7th Cir. 1986) (holding that, to recover damages
 representing benefits, a plaintiff must show that she
 actually incurred insurance or medical care expenses); Taylorv. Central Pa. Drug & Alcohol Servs. Corp., 890 F. Supp. 360,
 372 (M.D. Pa. 1995); Berndt v. Kaiser Aluminum & Chem. Sales,
 Inc., 604 F. Supp. 962, 965 (E.D. Pa. 1985). In this case,
 even if the budgeted value of benefits corresponding to
 plaintiff's salary had been less than the budgeted value of
 benefits corresponding to the salaries of the other
 department heads, plaintiff presented no evidence that she
 incurred insurance expenses. In addition, she presented no
 evidence that any employer-contributed retirement benefits
 were tied to the amount of her salary. Further, that
 benefits may have amounted to twenty-one percent of her
 supervisees' salaries does not mean that benefits constituted
 an equal percentage of higher salaries. Indeed, it would be
 logical to expect that employer insurance contributions at
 all salary levels were substantially the same and that,
 therefore, benefits were a considerably lower percentage of
 higher salaries. Because there was no competent evidence
 from which a reasonable jury could conclude that Dr. McMillan
 suffered any loss in benefits as a result of her lower
 salary, Dr. McMillan's back pay award should be accordingly
 reduced by the amount of the lost benefits award.
 Defendants' third argument is that we should import the
 three-year cap on back pay liability under the EPA, see 29
 U.S.C. 255, to Dr. McMillan's state back pay award under
 chapter 151B. This argument is without merit. No court
 decisions impose such a cap under Massachusetts law, and
 defendants present no rationale as to why state law should be
 the same as federal law. Further, Mass. Gen. Laws ch. 151B,
 as interpreted by the Supreme Judicial Court of Massachusetts
 ("SJC"), mandates "make-whole relief," which encompasses
 damages which are "the natural and probable consequences of
 the illegal conduct." Conway v. Electro Switch Corp., 402
 Mass. 385, 388 (1988) (internal citation omitted). Indeed,
 the SJC has declined to follow federal precedent in order to
 interpret chapter 151B more liberally than the federal courts
 have interpreted parallel federal law provisions. See Lynn
 Teachers Union, Local 1037 v. Massachusetts Comm'n Against
 Discrimination, 406 Mass. 515, 521 n.7 (1990). We thus
 decline to adopt defendants' suggestion.
 Fourth, defendants contend that Dr. McMillan's punitive
 damages award against the MSPCA on her pay discrimination
 claim should be set aside, or, alternatively, that a new
 trial should be granted on the issue. They challenge the
 punitive damages award on the basis that it was unwarranted,
 excessive, and obtained as a result of irrelevant testimony
 about Dr. Gambardella's termination of Dr. McMillan. We
 agree with defendants that the award was unwarranted and
 excessive.
 In a lawsuit such as this one, in which state law provides
 the basis of decision, "the propriety of an award of punitive
 damages for the conduct in question, and the factors the jury
 may consider in determining their amount, are questions of
 state law." Browning-Ferris Ind. v. Kelco Disposal, 492 U.S.
 257, 278 (1988). In reviewing an award of punitive damages,
 our role is to determine whether the district court abused
 its discretion in determining that the jury's award of
 punitive damages was within the confines of state law and
 that defendants are not entitled to a new trial or
 remittitur. See id. at 279. Although juries have wide
 discretion in determining the amount of punitive damages, and
 the trial court has broad discretion to affirm the jury's
 award of damages, see Fishman v. Clancy, 763 F.2d 485, 489-90
 (1st Cir. 1985), appeals courts should reduce or set aside
 awards that are "grossly excessive" or "shocking to the
 conscience," id. at 489 (citing LaForest v. Autoridad de Las
 Fuentes Fluviales De P.R., 536 F.2d 443, 447 (1st Cir.
 1976)).
 The jury in this case assessed punitive damages under chapter
 151B against the MSPCA in the amount of $135,662.50 and
 against Dr. Thornton in the amount of $171,250. Although the
 statute authorizes punitive damages, see Mass. Gen. Laws ch.
 151B, 9, it does not specify when they should be awarded. 
 However, other punitive damages provisions in Massachusetts
 law provide that such damages shall apply only on a finding
 that defendants' conduct was wilful, wanton, or reckless,
 see, e.g., Mass. Gen. Laws ch. 229, 2, and the SJC has
 further refined the criteria, holding that punitive damages
 are warranted "where a defendant's conduct warrants
 condemnation and deterrence," Bain v. City of Springfield,
 424 Mass. 758, 767 (1997).
 Dr. McMillan contends that, because the jury found
 intentional discrimination, she was eligible for an award of
 punitive damages if the jury so decided in its discretion. 
 We observe, however, that nowhere does Massachusetts law
 state that a finding of intentional discrimination
 necessarily justifies an award of punitive damages. This
 accords with the logic that, even in situations involving
 intentional misconduct, compensatory damages may provide
 sufficient punishment and deterrence. See Smith v. Wade, 461
 U.S. 30, 52 (1983); see also Rowlett v. Anheuser-Busch, Inc.,
 832 F.2d 194, 205 (1st Cir. 1987) (holding that, even though
 a jurisdiction may authorize punitive damages in cases
 requiring proof of intentional wrongdoing, "[t]hat does not
 mean that punitive damages are appropriate in every [such]
 case").
 The district court's jury instructions on punitive damages
 were that the jury could award punitive damages if it found
 defendants' conduct to have been "egregious and beyond the
 pale of tolerable," and that such damages are "intended to
 punish the defendants as a warning, both to them and other
 like-minded individuals, that society will not tolerate
 grievous discriminatory behavior." The district judge
 further stated that "[a]ny sum you award as punitive damages
 should be commensurate with your own conscience, the
 outrageousness of the conduct that you intend to punish, and
 the character of the MSPCA as both an employer and as a
 nonprofit enterprise." As these instructions imply, above
 the inquiry for finding intent, the jury had to conduct a
 second inquiry to determine whether defendants' intentional
 conduct was egregious enough for an award of punitive
 damages. Cf. Smith, 461 U.S. at 52 (observing that whether
 punitive damages are appropriate turns on whether the
 tortfeasor's conduct "is of the sort that calls for
 deterrence and punishment over and above that provided by
 compensatory awards"). It follows, then, that just as we may
 review the record to determine whether a reasonable jury
 could have found that the defendants intentionally
 discriminated against Dr. McMillan, we may also review the
 record to determine whether a reasonable jury could have
 found defendants' conduct sufficiently worthy of condemnation
 and deterrence to justify exemplary damages.
 Although we affirm the jury's finding of discrimination, we
 cannot say, on the basis of the record before us, that Dr.
 Thornton's and the MSPCA's intentional misconduct calls for
 punishment and deterrence beyond that secured by the
 compensatory award. Determining what conduct rises to the
 level at which an award of punitive damages is appropriate is
 a difficult task, but the evidence shows that the actions at
 issue in this case do not. We therefore hold that the
 district court abused its discretion in upholding the award
 of punitive damages, and that the award of punitive damages
 in this case constitutes a grossly excessive award of damages
 that shocks the conscience. 
 Fifth, defendants argue that the MSPCA's liability is limited
 to $20,000 by a damages cap for charitable organizations
 under the Massachusetts charitable immunity law, which
 provides that liability for any "cause of action based on
 tort brought against a [charitable] corporation" shall not
 exceed $20,000 exclusive of interest and costs. See Mass.
 Gen. Laws ch. 231, 85K. Although this statute applies to
 negligent, reckless, and intentional torts in the employment
 context, see St. Clair v. Trustees of Boston Univ., 25 Mass.
 App. Ct. 662, 665-66 (1988), it has been unclear whether a
 claim under chapter 151B is a "cause of action based on tort"
 and thus subject to the $20,000 limitation. We conclude that
 it is not.
 Defendants and plaintiff engage in extensive exercises of
 interpretation to suggest the relevance of a variety of cases
 to this issue. Ultimately, we agree with Dr. McMillan that
 Linkage Corp. v. Trustees of Boston Univ., 425 Mass. 1, 27
 (1997), provides the most guidance. In that case, the SJC
 held that the chapter 231, section 85K damages limitation
 does not apply to damages awarded under Mass. Gen. Laws ch.
 93A, the Massachusetts Consumer Protection Statute, on the
 basis that chapter 93A "creates an independent statutory
 basis of liability" and "forbid[s] conduct not previously
 unlawful under the common law of contract and tort or under
 any prior statute," id. (internal citation omitted). Like
 chapter 93A, chapter 151B creates rights that did not exist
 under the common law, see, e.g., Melley v. Gillette Corp., 19
 Mass. App. Ct. 511, 512-13 (1985), aff'd, 397 Mass. 1004
 (1986); the causes of action to which it gives rise thus
 cannot properly be called causes of action in tort. 
 Accordingly, we hold that the damages award to Dr. McMillan
 pursuant to chapter 151B is not subject to the constraints of
 chapter 231.
 Defendants next contend that the district court misapplied
 the relevant legal standard when it awarded attorney's fees
 because it did not award the appropriate hourly rates for the
 different types of services performed and instead allowed Dr.
 McMillan's counsel to recover her standard hourly rate ($285
 per hour) for performing tasks appropriate to either a less
 experienced lawyer or a secretary or paralegal. We agree.
 We have established that "clerical or secretarial tasks ought
 not to be billed at lawyers' rates, even if a lawyer performs
 them." Lipsett v. Blanco, 975 F.2d 934, 940 (1st Cir. 1992). 
 Thus, "[t]ime spent on clerical or secretarial tasks by
 attorneys should be compensated at a rate commensurate with
 the nature of the tasks." Massachusetts Dep't of Pub. Healthv. School Comm. of Tewksbury, 841 F. Supp. 449, 460 (D. Mass.
 1993); see Deary v. City of Gloucester, 789 F. Supp. 61, 66
 (D. Mass. 1992), aff'd, 9 F.3d 191 (1st Cir. 1993). We think
 that it was an abuse of discretion to award the same rate for
 all tasks performed by Dr. McMillan's counsel, without regard
 to the nature of the tasks. Accordingly, we remand this
 issue in order that the court may determine those tasks which
 could have been adequately performed by a less-experienced
 lawyer or by a secretary or paralegal. The compensation for
 tasks so designated should be reduced to an appropriate
 level.
 Finally, defendants argue that the trial court erred by
 computing interest on the back pay award from the date on
 which the cause of action accrued, rather than from the date
 plaintiff filed her complaint. This argument has no merit. 
 As the district court stated, "the purpose of interest is to
 insure that the present value of an award fully compensates a
 plaintiff for her losses." Moreover, the SJC has held that
 an award of interest may be used to make an aggrieved party
 whole in chapter 151B actions. See Conway, 402 Mass. at 390
 n.7. Here, an award of interest from the date Dr. McMillan
 was paid less than her counterparts comports with these
 standards.
 C. Cross-Appeal
 Plaintiff cross-appeals from the district court's grant of
 judgment as a matter of law in favor of defendants setting
 aside the jury's finding that Dr. Gambardella had tortiously
 interfered with Dr. McMillan's employment relationship with
 the MSPCA. She argues that she presented ample evidence
 during the trial to show that Dr. Gambardella's actions
 leading up to and including her termination were based on "an
 improper motive, active animosity and spite." We do not
 agree.
 Viewing the evidence in a light most favorable to the
 plaintiff, see Morrison, 108 F.3d at 436, we conclude that
 the evidence did not permit a reasonable jury to find for the
 plaintiff. Under Massachusetts law, to make out the tort of
 intentional interference with a contractual relationship, a
 plaintiff must present evidence of "actual malice" or a
 "spiteful, malignant purpose, unrelated to the legitimate
 corporate interest." Shea v. Emmanuel College, 425 Mass.
 761, 764 (1997) (quoting Wright v. Shriners Hosp. for
 Crippled Children, et al., 412 Mass. 469, 476 (1992)). In
 addition, "[w]hen an employer or supervisor is acting within
 the scope of his employment responsibilities, the hiring and
 firing decisions are privileged unless he acted with
 malevolence." Walker v. Waltham Hous. Auth., 44 F.3d 1042,
 1049 n.1 (1st Cir. 1995).
 Dr. McMillan presented evidence that Dr. Gambardella
 questioned her decisions and actions on various occasions,
 that he had her replaced as the head of a hospital committee,
 that he did not reprimand another doctor who made a derisive
 comment to her during a staff meeting, and that he terminated
 her without notice, had her summoned while she was involved
 in a complicated radiological procedure, and then barred her
 from the hospital grounds. To support her claim of tortious
 interference, Dr. McMillan points to O'Brien v. New England
 Tel. & Tel. Co., 422 Mass. 686, 687 (1996), in which the SJC
 held reasonable a jury's finding that an employer tortiously
 interfered with an employment relationship when he
 incessantly harassed employee, called her names in front of
 coworkers, and actively sought to make her cry. The facts of
 O'Brien are, however, much more egregious than those in this
 case. Insensitive though Dr. Gambardella's actions may have
 been, they did not demonstrate that type of ill will that the
 employer's actions in O'Brien did. We think that the
 district court properly concluded that these actions and
 statements did not demonstrate "anything more than a
 personality conflict with Dr. McMillan." For the most part,
 Dr. Gambardella's actions were properly within the scope of
 his duties as chief of staff at Angell, and, in any event,
 they failed to evince malevolent intent. No reasonable jury
 could have concluded otherwise.
 Dr. McMillan argues next that the district court erred by
 granting the MSPCA, Dr. Thornton, and Dr. Gambardella summary
 judgment as to her claim that her termination was in
 retaliation for her filing of an administrative complaint of
 sex discrimination in 1989. She asserts that the district
 court misapplied the law in ruling that she had failed to
 establish a causal connection between the filing and her
 termination because too much time had lapsed between the two
 events. She also argues that the court improperly viewed the
 facts from the defendants' perspective.
 We review the district court's grant of summary judgment to
 defendants de novo. See Associated Fisheries of Me., Inc. v.
 Daley, 127 F.3d 104, 109 (1st Cir. 1997). Further, to
 determine whether the summary judgment record is sufficient
 to support a finding that the employment action was
 retaliatory, we review only those facts that were available
 at the summary judgment stage, construing all facts and
 inferences therefrom in favor of the plaintiff. See Aybar v.
 Crispin-Reyes, 118 F.3d 10, 13 (1st Cir. 1997).
 To succeed on a retaliation claim under both state and
 federal law, when, as here, there is no direct evidence of
 retaliatory animus, a plaintiff must both establish a prima
 facie case and prove that the defendants' legitimate business
 reasons for terminating the plaintiff were pretextual. SeeFennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st
 Cir. 1996) (discussing Title VII's analytical framework);
 Lewis v. Gillette, Co., 22 F.3d 22, 24-25 (1st Cir. 1994)
 (observing that Massachusetts retaliation law parallels
 federal law). Specifically, to establish a prima facie case
 of retaliation, a plaintiff must show that (1) she engaged in
 protected conduct under federal or Massachusetts law; (2) she
 suffered an adverse employment action; and (3) a causal
 connection existed between the protected conduct and the
 adverse action. See Fennell, 83 F.3d at 535. Once the
 plaintiff has made a prima facie showing, the burden of
 production shifts to the defendant to articulate a
 legitimate, non-retaliatory reason for its employment
 decision. See id. If the defendant does so, the plaintiff
 must show that the defendant's proffered reason was not, in
 fact, the real reason for the decision and that the decision
 was the result of the defendant's retaliatory animus. Seeid.
 We conclude that Dr. McMillan did not establish a prima facie
 case because she presented no evidence of a causal link
 between her termination and the filing of her complaint. The
 strongest argument Dr. McMillan makes in this regard is that
 Dr. Gambardella urged her not to file an MCAD complaint,
 stating that her doing so would make their relationship
 difficult. But, in light of undisputed facts in the summary
 judgment record, this does not suggest a causal connection
 between Dr. McMillan's filing of the discrimination claim, on
 one hand, and the actual deterioration and eventual
 termination of the employment relationship, on the other. 
 The MSPCA and Dr. Gambardella asserted that Dr. McMillan had
 had an acrimonious relationship with other department heads
 and staff veterinarians at Angell, that she refused to treat
 birds after Angell refused to purchase her bird practice or
 pay her separately for the time she spent with avian
 patients, and that Dr. Gambardella received complaints from
 staff members about Dr. McMillan's attitude. Indeed, Dr.
 Gambardella stated that, by late 1991, his relationship with
 Dr. McMillan had deteriorated to the extent that he told Dr.
 Thornton that he would himself resign if Dr. McMillan were
 not terminated.
 In addition, we agree with the district court that, even if
 Dr. McMillan had established a prima facie case, she did not
 present material facts that would permit a reasonable jury to
 find that Dr. Gambardella's explanation for her firing was
 pretextual and influenced instead by a retaliatory motive. 
 Although plaintiff presented evidence that she continued to
 work hard and to maintain a good relationship with much of
 the veterinary staff, she simply did not proffer evidence to
 refute defendants' showing that the veterinary staff
 complained to Dr. Gambardella about her performance and
 demeanor. In light of this undisputed evidence, even if Dr.
 Gambardella may have exercised arguably poor business
 judgment in terminating her, and in doing so in an abrupt,
 clumsy, and unfeeling manner, it would be unreasonable on the
 evidence for a factfinder to conclude that his explanation
 for the termination was, in fact, not the true reason. We
 therefore decline to order a new trial on this issue.
 Third, Dr. McMillan argues that the district court improperly
 granted the MSPCA summary judgment on her claim that the
 MSPCA's failure to comply with the progressive discipline
 policy outlined in its Rules and Regulations Memorandum
 constituted a breach of contract because the policy was a
 contract governing her employment. She contends that the
 court improperly applied in a "wooden" fashion factors set
 forth in Jackson v. Action for Boston Community Dev., 403
 Mass. 8, 14-15 (1988), for determining whether a personnel
 manual's policy guidelines constitute a binding employment
 agreement. For support, she relies on O'Brien, 422 Mass. at
 691-93, in which the SJC held that the terms of an employees'
 manual become part of an implied employment contract if the
 parties so agree, even if the terms of the manual have not
 been negotiated, and even if, in a continuing employment
 relationship, an employee only reasonably believed that the
 employer "was presenting the manual as a statement of the
 conditions under which employment would continue." Id. at
 693.
 We agree with the district court's reasoning on this issue
 and its observation that, although personnel manuals may
 sometimes constitute an employment agreement, see Jackson,
 403 Mass. at 13, the facts Dr. McMillan alleged do not
 support such an inference. As the district court observed,
 "Dr. McMillan does not claim to have bargained for any of the
 terms of the manual, to have signed the manual, or to have
 executed any other employment agreement with the MSPCA. 
 Moreover, the manual described itself as a disciplinary
 guideline that 'is not all inclusive.'" McMillan v. MSPCA,
 880 F. Supp. 900, 910 (D. Mass. 1995). Contrary to Dr.
 McMillan's assertion, the court's analysis was not an
 application of inflexible prerequisites to finding an
 employment contract. Rather, the court's analysis employs
 the factors appropriately, as mere guidelines in the
 determination. See O'Brien, 422 Mass. at 692. We do the
 same. In addition to the factors highlighted by the district
 court, we note additionally that there is no evidence that
 Dr. McMillan reasonably expected that the MSPCA would follow
 the procedures with regard to her conduct or that of other
 supervisory veterinarians at Angell.
 Dr. McMillan's next argument is that she should be granted a
 new trial on her claim for emotional distress damages. Dr.
 McMillan withdrew that claim after the district court adopted
 a magistrate's ruling ordering the disclosure of records of
 Dr. McMillan's therapist, which defendants had requested
 during discovery. Dr. McMillan argues that we must review
 this matter de novo, in light of Jaffee v. Redmond, 518 U.S.
 1, 116 S. Ct. 1923 (1996), in which the Supreme Court
 recognized a federal privilege against the compelled
 disclosure of counseling records. In the alternative, she
 argues that the district court erred as a matter of law and
 abused its discretion in its determination of the privilege
 issue.
 We need not resolve these issues, however, because, as
 defendants rightly point out, Dr. McMillan's withdrawal of
 her claim for emotional distress damages constituted a waiver
 of the claim. This rule holds regardless whether new law has
 emerged which potentially may bolster a party's argument.
 Finally, Dr. McMillan argues that the district court abused
 its discretion by determining that attorney's fees
 representing work on Dr. McMillan's contract and emotional
 distress claims were noncompensable and, accordingly, by
 reducing the attorney's fee award by twenty percent. She
 argues that the court was wrong in concluding that the
 contract claims were severable and not connected to the
 discrimination claims and thus not compensable. Further, she
 contends that the claims together represent no more than
 three percent of the total time documented.
 As the district court correctly observed, fee awards are
 appropriate only for successful claims; unsuccessful claims
 warrant a fee award only if they are connected to the
 successful ones. Krewson v. City of Quincy, 74 F.3d 15, 19
 (1st Cir. 1996). Having determined that Dr. McMillan's
 unsuccessful emotional distress and contract claims were not
 connected with her successful claims, the court thought
 appropriate "some apportionment between successful and
 unsuccessful claims," and correspondingly reduced the award
 by twenty percent.
 "As a general rule, a fee-awarding court that makes a
 substantial reduction in either documented time or
 authenticated rates should offer reasonably explicit
 findings, for the court, in such circumstances, 'has a burden
 to spell out the whys and wherefores.'" Brewster v. Dukakis,
 3 F.3d 488, 493 (1st Cir. 1993) (quoting United States v.
 Metropolitan Dist. Comm'n, 847 F.2d 12, 18 (1st Cir. 1988)). 
 Although the district court did not explicitly state why it
 regarded the contract claims as unconnected to the
 discrimination claims, we do not think the court abused its
 discretion in making that determination and in denying fees
 for the time spent on that claim, or on the emotional
 distress claim, which is even more clearly unrelated to Dr.
 McMillan's successful claims.
 It is not so easily discernable, however, that twenty percent
 was a proper reduction. Although the district court has
 considerable discretion in determining fee awards, and
 although, as defendants point out, the fee petition is not
 amenable to easy analysis, our review of the fee petition
 does not convince us that the time plaintiff's counsel spent
 on the contract and emotional distress issues could
 reasonably be regarded as twenty percent of the total time
 documented. In such a situation, the district court
 should, at a very minimum, make clear why it chose to reduce
 the fee award by such a substantial percentage. Because the
 court in this case provided no elaboration for the reduction,
 we remand this issue to the district court for
 reconsideration. 
 III.
 CONCLUSION
 We affirm the district court's denial of judgment as a matter
 of law on plaintiff's pay discrimination claims and, in part,
 the jury's award of compensatory damages, and we vacate the
 jury's award of punitive damages. In addition, we remand for
 a recalculation of the damages in light of our determination
 that an amount representing lost benefits should not have
 been included in the award, and for recalculation of
 attorney's fees with regard to hourly compensation rates and
 the fee reduction for time spent on plaintiff's contract and
 emotional distress claims.
 SO ORDERED.